## THE MONMOUTH.[1]

### SMITH *v.* THE MONMOUTH and THE RARITAN.

### HOWARD *v.* SAME.

*(District Court, S. D. New York. January 9, 1891.)*

1. COLLISION—NEGLIGENCE—DAMAGE FROM STEAMER'S SWELLS—LIABILITY.
   A steamer which passes other boats at high speed, so near as to damage them by her displacement waves, is liable for such damage.

2. SAME—FAST STEAMER—DUTY IN PASSING OTHER CRAFT.
   The steamer M., a passenger-boat plying in the harbor of New York, whose usual speed was 20 miles an hour, passed within 1,000 feet of a fleet of about 30 canal-boats in tow of tugs. The displacement waves of the M. caused the boats of the tow to strike against each other, whereby one was sunk and another damaged. The steamer on this occasion did not notice the tow, and did not slacken her speed. The evidence indicated that the M. was accustomed, in passing near small boats or tows, to slacken speed or sheer away. It also appeared that the present accident was probably due to inattention on the part of the officers of the steamer to the tow, or to an erroneous estimate of its distance. The tugs were unable to turn the tow so as to take the waves stern on in the short time that elapsed after the M. was seen coming. No regulation required the tugs to signal, and so large a tow in broad day was a conspicuous object. *Held*, that the steamer was solely liable for the damage.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

In Admiralty.   Suits for damages occasioned to libelants' vessels by displacement swells of the steamer Monmouth.

*Butler, Stillman & Hubbard,* (*Mr. Cromwell,* of counsel,) for the Doran.

*Hyland & Zabriskie,* for the Sarah.

*Weeks & De Forest* and *Mr. Ledyard,* for the Monmouth.

*Robinson, Bright, Biddle & Ward,* for the tugs.

BROWN, J.   The above libels were filed to recover for damages sustained by the canal-boat William Doran and the canal-boat Sarah, caused by the displacement waves from the steam-boat Monmouth in the forenoon of July 14, 1890, while she was making her trip from Sandy Hook to pier No. 8, North river.   The canal-boats were part of a fleet of about 30 boats, in tiers of 4 each, lashed together in the usual way, and coming up the bay from South Amboy to New York in tow of the steam-tug Raritan and three other helpers, upon hawsers about 500 feet long.   The libelants' boats were the inside boats of the third tier.   The tow was making its way slowly against the first of the ebb-tide, at the rate of not over a mile or a mile and a half an hour; and at the time of the accident it was a little way to the westward of the Bell or black buoy, and about three-fourths of a mile to the southward of Fort William, heading for the North river.   The Monmouth is one of three large and swift passenger steamers built for speed, to make close connections with the railroad trains at Sandy Hook in the transportation of passengers to and from New York.   Each steamer makes three round trips daily.   The passengers in 1890 were about 400,000; an increase of 110,000 above the number for 1889, due to the better service and quicker time.   The displacement waves of these steamers, which make their trips of about 20 miles in a few minutes over an hour, is well known to be dangerous to small boats, if the steamers pass near them and at full speed.   Their usual practice has been to slow when coming near small craft or tows of this character, or to sheer away from them, if they lie too near their course.   On this trip, the tow was not observed by any of the officers or seamen of the Monmouth, and they testified that any tow near enough to be likely to suffer damage would have been noticed.   The other witnesses, while they differ considerably in the estimates or the *data* they give as to the distance at which the Monmouth passed them to the westward, mostly estimate her as not more than 600 or 700 feet distant; the extremes varying from one-half to twice that distance.   There is no doubt that the Monmouth, when passing the tow, was going at least at her usual speed of about 20 miles an hour, and that her displacement waves, which ran quartering astern at an angle of about four points, were such as to cause the forward tier of the tow, attached by four hawsers to the tugs, to break loose from the rest of the tow to which they were lashed.   The boats were described by the witnesses as jumping up on each other, and pounding each other, while the forward tier was submerged by the first wave.   The Doran was broken in her bow, and received some injuries astern, causing her to sink in a few minutes.   The Sarah was also damaged.   Another tow, a short distance ahead of this, also received some

injury. According to the defendants' evidence, the swells of various steamers at the dock at the Narrows were found upon measurement to be of the following height: Of the Monmouth, passing three-eighths of a mile distant, 17 inches; of the Sandy Hook, three-eighths mile distant, 18 inches; of a German steamer, one-half mile distant, 24 inches; of an English steamer, the same. This, however, was in very deep water. For the steamer, it is contended that she was pursuing her usual course, heading for pier 1, North river, and going a little nearer to the Statue of Liberty than to the Bell buoy. This would make her to have passed more than 2,000 feet distant from the tow, if the latter was within 500 feet of the Bell buoy, as the witnesses allege.

It has been urged with great ability and force by the counsel in this case, as well as in the case of *The Majestic, post,* 813, that such a distance from tows or other small craft is sufficient, and more than sufficient, to answer all the legal obligations of steamers in passing other boats; that though the rivers and harbors are a common highway for all, in which all have an equal right, yet this very equality of privilege excludes such methods of making up and navigating tows as impose unreasonable restrictions or obstacles in the way of passenger transportation; that in the increase of commerce, the growth of population, and the needs of passenger service, quick dispatch, such as the Sandy Hook boats offer, is an indispensable necessity; that the waves of those steamers, 1,000 feet from the steamers, are no greater than those made by ordinary gales; that tows like the present could not bear such ordinary waves from storms, and would be deemed unseaworthy to encounter them; that sometimes two of such tows in succession, as in this case, stretch over nearly half a mile, and proceed at so slow a pace as to become unreasonable obstructions; and that it is unreasonable that such a raft of boats, unseaworthy in their character and in their make-up as a mass, should be held entitled to such privileges as to preclude a fast passenger service, and thus virtually to monopolize the use of a common highway of commerce, and to prevent its beneficial enjoyment by the public in a rapid passenger traffic; that, if such tows also serve the public good in the form of cheaper transportation of some of the necessaries of daily life, they may be, and should be, modified in their make-up, in the character of the boats used, and in the power and speed of the tugs that haul them, so as to become reasonably compatible with the other general needs of the public.

Whatever force there may be in these views, I do not think, upon the facts as they appear in this case, that there has yet arisen any such actual conflict of rights or incompatibility in the mutual claims of these opposing interests as calls for any new application of familiar rules. The evidence shows that though at least eight of these fleets of tows usually pass daily up and down the bay, and though eighteen trips are performed daily by these fast Sandy Hook steamers, meeting or passing such tows under every variety of circumstances, only two accidents like this have been previously reported during the three years that these fast steamers have been running; and that accidents have been avoided

by slowing when passing tows too near for full speed, sometimes without previous danger signals from the tugs, and sometimes upon danger signals received from them. Under this usage, there have been no material delays upon the steamers' trips, no connections missed, no complaint of tardy arrivals, and no evidence of inconvenience to the public. On the contrary, so regular and efficient has been the rapid transit service that a very large and rapid increase has resulted in the public patronage. While these facts bear the highest testimony to the general skill, care, and prudence of the officers in command of these steamers, they are equally conclusive that such care and skill are ordinarily sufficient to avoid injury to tows like these, which for at least 15 years past have been accustomed to navigate the harbor upon the same routes and by the same methods pursued in the present case, and that, with such care, both may enjoy their common privileges without material injury or inconvenience to each other. The same facts make it probable, also, that the present accident was due to inattention to the tow, through some special causes, or to an erroneous estimate of its distance. The steamer's witnesses are at a great disadvantage in testifying as to the distance, since they did not notice the tow at all that day, and can only testify as to their usual course and practice. I do not find, however, that the usual course from buoy 18, off Bay Ridge, as stated by the quartermaster, viz., to head for pier 1, would, according to the chart, carry the steamer nearer to Liberty island than to the Bell buoy, but, on the contrary, about three-fourths of the way over towards the Bell buoy, or about 450 yards from it; so that, if the tow was from 300 to 600 feet west of the buoy, the steamer would have passed within 750 or 1,000 feet of the tow. This approaches the libelants' estimates quite as nearly as is to be expected in estimates of distances on the water. There had also been some fog in the lower bay that morning, hindering the steamer in reaching the starting point; and, although the quartermaster says that that caused him no delay at the start, no memorandum was kept of the time of departure, and the steamer arrived at pier 8 on time.

The weight of testimony and of probability, upon all the evidence, is that the steamer, through some preoccupation of her men, or false estimate of distance, went nearer than usual to the tow, and nearer than was safe at full speed, and that the accident arose from the failure to use the customary and requisite caution when going so near. She must therefore respond for the damage. *The Morrisania,* 13 Blatchf. 512; *The Drew,* 22 Fed. Rep. 852, (affirmed, on appeal;) *The Atalanta,* 34 Fed. Rep. 918. If but a single boat among so many had been injured by the pitching, there would have been room for the contention that her injury was due to her specially weak or rotten condition; but the violence of the shock is attested by the breaking of all the lines that attached the hawser tier to those behind, and this precludes that defense.

I do not think the Raritan and the helper tugs in this case can be charged with any legal fault. They could not turn the tow in the short time after the Monmouth was seen coming, so that they might take the wave astern, as would have been their duty if that were practicable.

*The Majestic, infra.* A half hour, it is said, would be needed to turn such a tow. She might, indeed, have signaled; but no regulation required signals, and in broad day so large a raft of boats in tow was a very conspicuous object. Its character was perfectly well known to the steamer, and the pilot of the tug had no reason to suppose any signal needed to the Sandy Hook boats for such a tow.

Decrees for the libelants against the Monmouth, with costs, and for dismissal as to the Raritan, with costs, with an order of reference to compute the damages.