\*R. M. ROSEMAN v. CAROLINA CENTRAL RAILROAD CO.

*Action for Damages—Negligence—Intoxication of Passenger—
Non-payment of Fare—Conductor of Train.*

1. The conductor of a railroad train is authorized to expel without using unnecessary force one who refuses to pay regular fare, at any point where he may safely get off, provided it be (as required by the statute, section 1962 of *The Code*) "at any usual stopping place or near any dwelling-house, as the conductor shall elect, on stopping the train"; and provided further that the ejected person is not willfully and wantonly exposed to danger of life or limb.

2. A conductor requiring an intoxicated man to leave the train for non-payment of fare does not render the carrier liable for the death of the man from exposure, where the conductor did not have reasonable ground to believe that the man was unable to find his way or walk to the nearest house or to the railroad station, or even to his own father's house, which was not far away.

3. A somewhat intoxicated passenger who gets off safely without assistance, when told that he must pay his fare or leave the train, and whom the conductor has seen a few minutes before in an eating-house demanding food and acting somewhat boisterously, may be reasonably supposed to be capable of reaching a place of safety where he is left in the evening, when it is neither raining nor freezing, within two hundred yards from a dwelling-house, and not far from the railroad station.

4. A conductor is not bound to act upon the volunteered opinion of a passenger as to the physical or mental state of a drunken man who has been expelled from the train where he has no reasonable ground to believe that the man is unable to find a place where he will be safe.

CIVIL ACTION, tried before *Bynum, J.,* and a jury, at Special Term, 1892, of LINCOLN Superior Court, wherein plaintiff, as administrator of Robert Murdock, sought to recover of the defendant damages for the negligent expul-

---

\*BURWELL, J., having been of counsel, did not sit on the hearing of this case.

sion of his intestate from defendant's train on an inclement night while he was intoxicated, thereby exposing him to the injuries resulting in his death.

The facts material to an understanding of the opinion of the Court are found in the plaintiff's evidence in chief and in that of Conductor Alderman. The other evidence is immaterial.

*Plaintiff's Evidence.*—L .L. Smith: " I knew Robert Murdock; in November, 1889, was staying at my house, had been more than a year—eighteen months; he had good habits; character good for honesty and industry; never been drunk at my house; heard of his being drunk once; was a healthy man; never missed a day at my house on account of sickness; was about twenty years old; I paid him ten dollars a month and board; I saw him November 16th a little before sundown; he left my house—said he was going to Iron Station; it was a very cold, bad evening, raining and sleeting—night cold, rainy and dark. He saved his money well. He felt his dram that evening."

J. C. Dellinger: " I saw negro man at my house at Iron Station night of 16th; saw him next day, dead, lying in water; while passengers were eating heard a noise; went to door; darky there said he wanted pair of boots; I slammed door; my little boy came in; said boy was out there; said he would shoot; was cursing; in a few minutes saw boy at window; when all got through eating went out with conductor; boy was on porch; asked him what he wanted; said something to eat; I gave him something; he told me to get money out of his pocket to pay; told him did not charge him; that was the last I saw of him; was a wet, rainy night; boy was drinking."

*Cross-examination.*—" Don't think it was raining while eating; was 7 P. M.; train stopped twenty minutes; began raining in twenty or twenty-five minutes after train left; I

did not know boy that night. I said to conductor while
boy was at the window that boy not too good to shoot; I
could not tell whether he was cursing or not; when I
went out he fell upon the porch; when I gave boy some-
thing to eat conductor had started to train about minute
from time; boy went right to train; train on main track;
side-track between main track and my house; side-track
elevated eleven inches; one hundred feet distant; no lights
but what I had and conductor's; he walked brisk when he
started to train; something over one hundred people in three
to four miles; dirt road down to railroad; deceased's body
found in direction of his father's home from Iron Station;
his body something over one hundred yards from one dwell-
ing-house, two hundred or more from another, another one-
fourth mile, another one-fourth mile; houses are scattered
around; body little over half mile from depot; houses reach-
ing up in direction of body from depot within couple hun-
dred yards of the body; body twenty feet from railroad
track; head in a foot or two of dirt road; his father's house
two miles from depot; body about same distance; in going
home from station would go up the road; saw no whisky on
body; found eight dollars in money; saw no bruises on
body; looked to see; railroad is level for a mile; embank-
ment six feet high where body found; country level; can
see lights on railroad where body lying; don't think there
had been rain enough to gather water before dark; water
must have gathered after."

*Cross-examination.*—" Side-track seven or eight feet from
main track; lights in train; road to Rhinehart's turn-out,
in edge of town, about three hundred yards from depot;
could not see lights of town from where body lying; don't
know whether could have seen the nearest house; it was on
other side of fill."

J. A. Hoyle: "I was on coroner's jury; saw body before moved; was three-quarters mile from Iron Station, lying head in few feet of public road; feet in water; twenty-six feet from rails; is a fill there about eight feet high; water gathered at foot of fill came almost to his hips; body on north side of track, about two hundred yards to nearest house. I stepped it, it was on south side of track; could not see house from where body lay; next nearest house on north side one-quarter mile; don't think in view, rather in a grove; could not see lights of town from where the body lay; John Murdock lived on Lynch's land; to go there from where the body lay would go road to about two hundred yards of depot and get in road; there is a path about one hundred yards below where the body was; it was a cold, rainy, dark night; began sleeting just before dark, about sundown; don't know whether it was sleeting after dark or not; we went up next morning; saw no tracks in fill; was a dent in side of fill like he fell on head or shoulders, eight feet from rails, at foot of fill; bank of dirt not covered by water; no tracks on that, but near that; we looked for tracks; did not find any."

W. H. Miller: "I was on train Saturday night, about middle of November; darky got on, was put off; I first saw him at station; then saw him on train; saw him come in before train started; he sat on arm of seat; leaned over; made noise like snoring; in a minute or so after the train started conductor came, asked him if he had ticket; said, 'No'; asked if he had money; put hand in vest pocket, said, 'No'; conductor said, 'You will have to get off'; pulled the cord; said 'Come with me'; conductor started in front, negro followed; brakeman followed with lantern; boy took hold of lantern; brakeman said, 'Let it loose'; they went to rear of car; conductor standing in middle of car; boy on left; brakeman same side; conductor said

'Let him get off by himself'; I saw conductor all time; did not see brakeman all time; train started; conductor came up to where I was—"

Here the plaintiff proposed to prove by the witness that, just as the train moved off, the conductor turned from the door and came to where the witness was and that the witness said to him: "Captain, won't that negro freeze to death to-night?" To this evidence the defendant objected, and the plaintiff then stated that he offered this evidence for the purpose of showing notice to the company of the probable consequence to the negro by being put off. The objection of the defendant was overruled and the evidence was admitted, and the defendant excepted.

Witness answers: "After train started, got a little way, conductor came up to me; I said 'Captain, won't that negro freeze to-night?'; he said 'Oh, no; he lives near here, and it is only a few hundred yards from the station.' I think train was then between one-quarter or one-half mile from Iron Station; boy got on front left-hand side of car; had pair shoes; sat about three seats from where I was at front end; I went to negro, said 'You in wrong coach'; he said 'Hey?'; I said 'In wrong coach'; he said 'I reckon not'; he was drunk; the snoring or heavy breathing was before I spoke to him; don't know whether he was sitting on arm of seat or on seat when conductor came to him; can't say whether he was leant over then or not; conductor was between us."

*Cross-examination.*—"I was at stove at other end of car from where boy put or got off; conductor used no violence; put his hand once on his coat collar; brakeman used no violence; saw nothing indicating violence; they had a light out on platform; it was not raining at the time; had been before, and it rained after that; clear when we left Charlotte; rain struck us fifteen miles from there; rained heavy

in showers, and on that night think it sleeted some; don't think it had started at Iron Station; negro created no disturbance on train."

Dr. Crouse, practicing physician twenty-one years (admitted expert): "I examined Murdock; was dead; examined at inquest of Coroner; he was frozen to death."

*Cross-examination.* — "Weather was rough; no ice on ground, had been sleet; no bruises, except rather deep scratch on finger; examined head and neck closely; no evidence of any violence."

*Defendant's Evidence.*—Alderman: "I was conductor on train; been conductor seventeen years; Murdock boarded my train at Stanley's Creek; had second-class ticket to Iron Station; was twenty-one minutes from Stanley to Iron Station; eighteen minutes at station. I suppose same negro I saw at eating-house; he was outside cursing, making threats towards Dillinger, and came to window of eating-house; looked in. After supper Engineer Crowel and myself went to train; left negro on porch; went to train and left immediately. I went in first-class car, asked for ticket, then fare; said he had none; told him he must get off; he said 'All right, Captain.' I pulled line, told him to come on; told brakeman to assist him; got on platform, told brakeman to let him get off by himself; he did get off; I held light; he was standing safe on ground; several on train; brakeman on steps of rear platform when boy got off; no force used, he got off himself. He was able to have taken care of himself and to have gotten home when I left him; could not have been more than one and one-half minutes from time train started till it stopped; had gone between a quarter and half a mile; was a safe place; fill three feet high. Lights of Iron Station could be seen; were houses on right and left of the track; raining when I left Charlotte; not raining at Stanley or Iron; not raining

when he got off; not an unusually cold night; was freezing next morning; was not freezing up to half past nine; don't remember the conversation with Miller; if so, it was after I talked to the little girl. No hesitation in what he said—that he had no ticket or money; not asleep."

*Cross-examination.*—"Was sitting on seat when I went for ticket; saw him in a minute or minute and a half after I saw him at eating-house. He was drinking—neither sober nor drunk; did not tell brakeman to assist him because he was drunk, but to assist in ejecting him from the train. I was before Coroner; think I stated where I put him off; don't know the exact point. I said fill was three feet high, because from the position, if man could see it, was about that high; can't tell exact point, because did not look to see. He was standing at foot of fill when I left him. I meant what I said when I told the girl about drunken negroes—you might say he was drunk, but not too drunk to take care of himself."

The jury, by their verdict, awarded $1,000 damages, for which there was judgment, and defendant appealed.

*Messrs. Jones & Tillett* and *D. W. Robinson*, for plaintiff.
*Mr. P. D. Walker*, for defendant (appellant).

AVERY, J.: The plaintiff's intestate got upon the defendant's passenger train at Iron Station, and, failing or refusing to produce a ticket or pay fare on demand of the conductor, was ejected a little more than a half mile from that place and within two hundred yards of a dwelling-house. There was testimony tending to show that the intestate appeared to be drunk at the station while the passengers were taking supper there, and had come as a passenger from Stanley to Iron Station (about twenty-one miles) on the same train, having purchased a ticket from one station to the

other.    The conductor testified that he considered him
neither sober nor drunk, and a witness for the plaintiff cor-
roborated his statement that the intestate when ordered to
get off the train followed him to the platform and then
stepped off without assistance from the brakeman, who held
his lamp for him to see in alighting.    The only direct evi-
dence as to the nature of the ground where he was ejected
was that of the conductor, who said that he went down an
embankment about three feet high.    He was found next
morning frozen and in the water that had collected near
the center of an embankment eight feet high, three-fourths
of a mile from the station.

Where there is no statute prescribing where or when
recusant or disorderly passengers must be ejected, the officer
in charge of trains, as a rule, is authorized to expel, with-
out using unnecessary force, one who refuses to pay regular
fare, at any point where he may safely get off.    *Pickens* v.
*Railroad*, 104 N. C., 312; *Clark* v. *Railroad*, 91 N. C., 506.
The statute (*The Code*, §1962) affirms this right, subject to
the limitation that the expulsion must be either "at any
usual stopping place or near any dwelling-house, as the con-
ductor shall elect, on stopping the train."    It is admitted
that the plaintiff's intestate was put off, without using force,
near a dwelling-house, and not remote from a station.    But,
where the power expressly given by law is exercised in such
a manner as to willfully and wantonly expose the ejected
person to danger of life or limb, the company is still liable
for injury or death resulting from the expulsion.    Cases,
falling within this last exception to the general rule and
not intended to be included under the statute, arise where
the persons ejected are manifestly too infirm to travel or
too much intoxicated to be trusted to find the way to the
nearest house or station.    3 Wood R. R. Law, sec. 362; 2
Sherman & Red. Neg., sec. 493; *Railroad* v. *Right*, 34 Am.
Rep., 277.

The question, therefore, which first confronts us is whether in any view of the testimony the conductor had reasonable ground to believe that the plaintiff's intestate was so greatly under the influence of liquor as to be unable to find his way or walk to the nearest house or to the station. He was put off the train on the night of the 16th of November, 1889. According to the testimony of Miller for plaintiff and that of the conductor, it was not raining, nor was it freezing at that early hour of the evening, though later in the night there was sleet, and the ground was frozen next morning. The conductor had heard intestate's demand for food at the supper-house and had seen him supplied. He next saw that he had got on the train and found him awake and declaring that he had neither money nor ticket. When told that he must get off the intestate arose, walked to the platform and got off without assistance. Under such circumstances was it the duty of the conductor to take him free of charge to the next station, lest he should drink more, or the intoxicants that he had already drunk should take effect and subsequently render him unable to travel? We think not.

It was but natural to infer that one who could find his way to the eating-house and demand food and thence into the train again could follow a road hard by when he was put off, and which it seems the conductor knew led to his father's house only a short distance off. His boisterous behavior at the station, so far as it seems to have come under the observation of the conductor, clearly indicated that it might become necessary to expel him for disorderly conduct, but was not calculated to excite apprehension that he might prove physically unable to return to the station or reach a house in the immediate vicinity of the point where he got off. The statement of the conductor that he saw him land without assistance " safe upon the ground "

being undisputed by any direct evidence, the conductor
was warranted in acting upon the supposition that he would
seek and reach a place of safety.    Had he shown symptoms
of infirmity or of stupor in presence of the conductor, or
had there been any dispute as to what the demeanor of
the intestate had been in his presence, it might have been
for the jury to determine whether the conductor had rea-
son to believe he was physically or mentally incapacitated
for traveling by reason of intoxication.    Waiving the objec-
tion to the competency of the question propounded to Alder-
man by the witness Miller, just after the deceased was
expelled, we think that the answer of the former, "Oh, no;
he lives near here, and it is only a few hundred yards to
the station," sufficiently shows the reasonableness of his
course from his own stand-point.    It would place a premium
upon drunkenness and subject companies and passengers
to needless delay and danger if officers in charge of trains
were bound, in order to save the companies harmless, to act
upon an off-hand opinion ventured by a passenger instead
of their own well-founded view of the situation, and stop
the train to hunt for or pick up an ejected trespasser.    This
is one of the thousands of terrible casualties due to the
immoderate use of spirituous liquors.    If there is a moral
accountability at the door of any person other than the victim,
or should be a legal liability elsewhere, we see no ground for
saddling the responsibility upon a common carrier whose
conveyances are so frequently resorted to by such boister-
ous and violent men to the annoyance of sober and orderly
passengers.    We are unwilling to lay down the principle
that a conductor subjects his company to liability for refus-
ing to act upon the volunteer opinion of any passenger as
to the physical or mental state of a drunken man who has
been expelled.

We think that there was no evidence, competent or incompetent, that fairly raised the question whether the conductor had reasonable ground to believe that the intestate was too infirm by reason of intoxication to reach a place where he would be safe, and upon the answer to that inquiry the liability of the company depended. In the absence of any sufficient testimony to make the company liable for willful disregard of the intestate's danger on the part of Alderman we think that the Court below erred in submitting the case to the jury at all. In this view of the evidence it is unnecessary to mention particular prayers for instructions, or exceptions arising from the refusal to give them.

In the most favorable aspect of the testimony for the plaintiff the conductor had notice that the deceased was drinking and disposed to be quarrelsome at the station, and saw that he was under the influence of liquor when he was expelled from the train; but there was no evidence of physical infirmity or mental incapacity, such as to excite a reasonable apprehension that he would be unable to walk to a house or to his home. Alderman was not bound, because of what he did see and hear, to institute inquiry among the other passengers before ejecting the intestate, or to act upon their opinions given afterwards, when he had no reason to believe that the intoxication had deprived the intestate of the mental capacity to find his way, or the physical power to follow it to a neighboring house or to the station. However much such accidents are to be deplored justice and public policy alike forbid that the failure of the conductor in charge of a train to consult the fellow-passengers of a man who refuses to pay fare and appears to be somewhat intoxicated, as to his ability to provide for his own safety, shall be declared negligence, such that a jury are at liberty to find it the proximate cause of injury or death befalling him after expulsion.

"For the reasons given we think there was error in submitting the question of defendant's negligence to the jury at all upon the evidence, and the defendant is therefore entitled to a                           New Trial.