JOHN ADAMS, v. CHICAGO GREAT WESTERN RAILROAD COMPANY and J. C. EVANS, Appellants.

**Railroads:** EJECTION OF PASSENGERS: INTOXICATION.   The statute 1 authorizes railway companies to eject intoxicated passengers from their trains as a protection to the traveling public from the misconduct of drunken and disorderly persons; but in doing so they are not at liberty to use excessive force, or to knowingly imperil life or limb.   In the instant case the conductor was justified in ejecting plaintiff, not only on the ground of intoxication but also because of refusal to pay his fare.

**Same:** EJECTION OF PERSONS FROM STATION.   A railway company may 2 forcibly eject persons from its passenger stations, except within a reasonable time before, during or after the arrival and departure of its trains; but are not permitted to knowingly imperil the life or limb of such persons in so doing.

**Evidence:** ADMISSIONS.   The admissions of a party to an action
3   should not be excluded because his attention was not called to
them while testifying as a witness.

**Railways:** EJECTION OF PASSENGER FROM STATION : EXCUSE: EVIDENCE.
4   Proof .that a station agent offered to take an intoxicated .person
whom he had excluded from the station home with him, did not re-
lieve the company from liability for his injury from exposure,
where the agent must have known that he was in such condition
that he did not understand the offer.   In the instant case the evi-
dence is such as to require submission of the questions whether
the agent offered to take the plaintiff home with him, or whether
.the agent knew that plaintiff did not understand the offer.

*Appeal from Wright District Court.*—HON. R. M. WRIGHT,
Judge.

.FRIDAY, MARCH 15, 1912.

ACTION for damages resulted in judgment against
both defendants, from which they appeal.—*Reversed.*

*Carr, Carr & Evans* and *Birdsall & Birdsall* for appel-
lants.

*J. W. Henneberry* and *McGrath & Archerd* for ap-
pellee.

LADD, J.—In the afternoon of December 7, 1909,
plaintiff was discovered lying on the floor in a box car in
a train which had just reached Lehigh over a branch line
of the defendant from Ft. Dodge to that place.   The at-
tention of the train crew being directed to him, he was
assisted to the depot platform.   Though he testified to hav-
ing boarded a passenger car at Ft. Dodge, the conductor
and brakeman denied having seen him there, and he offered
no explanation of his exit from a passenger car to the box
car in which he was found on the way.   He remained at
the depot in Lehigh until the train was ready to return

to Ft. Dodge, nearly two hours, and then boarded the passenger car. Upon demand for fare, he tendered a ticket from Ft. Dodge to Eagle Grove, which was declined, and though requested twice thereafter, failed and refused to pay the same, and was directed to leave the train at Evanston, the next station. This was about five o'clock p. m. of the same day. He did as required, and after standing on the platform a few minutes, entered the depot. After the agent, defendant Evans, had completed his work, about thirty minutes later, and was ready to go to his evening meal, plaintiff was required to leave the depot so that it could be locked and started on foot toward Ft. Dodge, about eight miles distant. After walking along the railroad track for some distance, he appears to have entered a corncrib, and to have slept there until about five o'clock the next morning. At that time he called at a house in Evanston where it was discovered that both his feet were frozen, and also two fingers of his right hand. Both feet and one finger subsequently were amputated. Two grounds of negligence are charged: (1) In ejecting plaintiff from the train at Evanston, knowing that he was intoxicated to such an extent as to be unable to care for himself, and that the weather was cold; and (2) in ejecting plaintiff from the depot and premises of the railway company at Evanston, knowing him to be in the condition stated, and unable to take care of himself, in the cold, and that there was no hotel or other place where he could obtain shelter from the inclemency of the weather.

I. That the plaintiff was in a state of intoxication when required to leave the passenger car at Evanston is undisputed. Section 2 of chapter 141 of the Acts of the Thirty-Third

1. RAILROADS: ejection of passengers: intoxication.

General Assembly provides that "any conductor of a railway train or street car carrying passengers shall have the right to refuse to permit any person, not in the custody of an officer, to enter any passenger car on his train or street car in his

charge, who shall be in a state of intoxication; and shall have the further right to eject from his train at any station or from his street car at any regular stop any person found in a state of intoxication or drinking intoxicating liquors as a beverage, or using profane and indecent language on any passenger car of his train or any street car under his charge and for that .purpose may call to his aid any employee of the railway or street car company." This conferred on the conductor ample authority to expel plaintiff from the train. He might have excluded him from the car when he undertook to enter it at Lehigh, had he elected to have done so, but the circumstance that plaintiff succeeding in getting aboard through the oversight of members of the train crew or for any other reason did not deprive the conductor of the right expressly conferred by this statute to eject him therefrom. Nor is a conductor in ejecting such passenger bound to select any particular station at which to do so. The statute in the plainest possible terms authorizes this to be done "at any station." Of course, this will not justify the use of excessive force in accomplishing what may be done, nor does such a statute afford any protection against the willful or wanton conduct of a conductor in ejecting a person even at a station. The condition of an intoxicated person doubtless might be such that to leave him to find his way even to the nearest house or the station would imperil his life or limb, and in that event the conductor would not be excusable in knowingly exposing him to such danger. *Roseman v. Railway,* 112 N. C. 709 (16 S. E. 766, 19 L. R. A. 327, 34 Am. St. Rep. 524). But this is not such a case. The plaintiff in leaving the car walked erect and reached the station, which was open, safely, and, though there was no hotel in the place, there were ten or twelve dwelling houses not far from the depot, and, in the absence of all proof, it is not to be assumed, nor was the conductor bound to assume, that a person even in plaintiff's condition then could not have

found shelter from the inclemency of the weather at the station, or in some of these dwellings. If the conductor was then aware that plaintiff was in a helpless condition, the record does not disclose the fact. A passenger testified that he sat straight in the seat and walked erect in leaving the car, but that she thought him kind of stupid, and that he did not seem to know what he was doing, for that, when the conductor refused the ticket from Ft. Dodge to Eagle Grove, he fumbled in trying to get his hand into his pocket. Undoubtedly this conduct was an indication of intoxication, but it alone should not be accepted as establishing helplessness.

Common carriers are required to exercise a very high degree of care in the protection of travelers being transported against the misconduct of drunken and disorderly persons, and the manifest design of this statute is to enable them to guard against the dangers incident' to their conveyance by authorizing them to refuse such persons as passengers or after becoming such to expel them from their passenger coaches.

The plaintiff not only was intoxicated, but had refused to pay his fare. The defendant did not owe him the duty of carrying him gratuitously, and might ordinarily eject him at the first station reached. The record is without evidence from which it could rightly have been found that the conductor in doing so violated any duty owing plaintiff, and the first ground of negligence ought not to have been submitted to the jury.

II. The plaintiff in declining to pay his fare had ceased to be a passenger, and, when ejected, can not be assumed to have entered the depot for the purpose of taking a train.

2. SAME: ejection of persons from station.
Even if he did, however, the agent was not bound to keep it open until the next train passed through on the following day. The waiting room is for the accommodation of incoming and outgoing passengers, and not ·a place of resort for the

general public, and though one entering it not as a passenger or on business with the company is not to be regarded as a trespasser, yet, upon a request to leave, it is his duty to do so, whether disorderly or not, and upon his refusal to go it is the right of the agent to eject him, using such force as is reasonably necessary. *Johnson v. Railway,* 51 Iowa, 25; *Beeson v. Railway,* 62 Iowa, 173; *McDonald v. Railway,* 88 Iowa, 348.

As the plaintiff was not there on business connected with the company, the agent owed him no affirmative duty. In the absence of information to the contrary, he might assume that plaintiff was capable of taking care of himself, and was not bound before ordering him out of the depot on closing to ascertain his actual condition. If, however, the apparent condition of plaintiff was that of helplessness or of intoxication, such as to render him incapable of caring for himself, in view of the inclemency of the weather, and he was in such condition actually, then it devolved upon the agent to exercise such care, and take such precautions for his safety as an ordinarily prudent person would under like circumstances. In short, he was not charged with notice of his actual condition, save as this was apparent from his conduct or talk or appearance. And even though plaintiff may have been in a drunken condition, he was not bound to play the good Samaritan and minister to his wants; but, when the station agent required him to leave the depot and go out in the cold night, the duty or obligation immediately arose to exercise ordinary care in what he did. In other words, though the agent may have had the legal right to require the plaintiff to vacate the room he was occupying, yet, in doing so, he was bound to take into consideration the plaintiff's condition, and to exercise ordinary care for his protection. Undoubtedly the plaintiff's condition was due to his past misconduct, but this did not excuse the defendants when brought in relation with him from exercising due care in

availing themselves of their legal right with respect to his expulsion. They were required to exercise ordinary care in the immediate action in which they were engaged, and, if that action was calculated to create circumstances which would imperil human life or limb, they must guard against such contingencies as an ordinarily prudent person would under the circumstances.

In other words, though the defendants had the legal right to exclude persons from the depot, save within a reasonable time before, during, and after the arrival and departure of trains, in exercising that legal right, they might not do so in a manner to imperil the life or limb of persons who were in the depot. In *Depue v. Flateau,* 100 Minn. 299 (111 N. W. 1, 8 L. R. A. (N. S.) 485), the plaintiff, who was a stock buyer, called at the defendant's house to look at cattle, but, as it was late, proposed to remain overnight, and examine them more carefully in the morning. His request was refused, but he was invited to and did remain for supper. After eating, he was taken sick. Though this was known to defendants, they refused to permit him to remain overnight, put him in his cutter, and, though he was unable to drive the team, started it off toward his destination. After going about a half mile, he fell from the cutter, and lay in the snow all night, to his great injury, and the court held that a case was made out on which damages might be allowed, saying after quoting from *Union Pacific Ry. Co. v. Cappier,* 66 Kan. 649 (72 Pac. 281, 69 L. R. A. 516):

The facts of this case bring it within the more comprehensive principle that whenever a person is placed in such a position with regard to another that it is obvious that, if he does not use due care in his own conduct, he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation in which he thus finds himself, and with which he is confronted, to avoid such danger; and a negligent failure to perform the duty renders him liable for the consequences of his neglect.

This principle applies to varied situations arising from non-contract relations. It protects the trespasser from wanton or wilful injury. It extends to the licensee, and requires the exercise of reasonable care to avoid an unnecessary injury to him. It imposes upon the owner of premises, which he expressly or impliedly invites persons to visit, whether for the transaction of business or otherwise, the obligation to keep the same in reasonably safe condition for use, though it does not embrace those sentimental or social duties often prompting human action. 21 Am. & Eng. Ency. Law, 471; Barrows on Negligence, 4. Those entering the premises of another by invitation are entitled to a higher degree of care than those who are present by mere sufferance. Barrows on Negligence, 304. The rule stated is supported by a long list of authorities, both in England and this country, and is expressed in the familiar maxim, *Sic utere tuo,* etc. They will be found collected in the works above cited, and also in 2 Thompson on Negligence, 1702. It is thus stated in *Heaven v. Pender,* 11 L. R. Q. B. Div. 496: The proposition which these recognized cases suggest, and which is, therefore, to be deduced from them, is that whenever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense did think would at once recognize that, if he did not use ordinary care and skill in his own conduct with regard to those circumstances, he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger. It applies with greater strictness to conduct toward persons under disability, and imposes the obligation as a matter of law, not mere sentiment, at least to refrain from any affirmative action that might result in injury to them.

The cases bearing on the proposition stated are collected in 69 L. R. A. 513. See, also, *Haley v. Railway,* 21 Iowa, 15; *Weymire v. Wolf,* 52 Iowa, 533; *Louisville, C. & L. Ry. Co. v. Sullivan,* 81 Ky. 624 (50 Am. Rep. 186); *Haug v. Railway Co.,* 8 N. D. 23 (77 N. W. 97, 42 L. R. A. 664, 73 Am. St. Rep. 727); *Louisville & N. Ry. Co. v. Ellis,* 97 Ky. 330 (30 S. W. 979); *Black v. Railway,* 193 Mass. 448 (79 N. E. 797, 7 L. R. A. (N. S.)

148, 9 Ann. Cas. 485). The principle is not different from that involved in the ejection of a person from a passenger train upon refusal to pay for transportation.

The agent required plaintiff to leave the depot at about five o'clock in the afternoon, walked up with him to the elevator nearby, then returned to the depot before going to supper. After the evening meal, he returned to the depot about one-half or three-quarters of an hour, and then called upon a sick person for about an hour and a half, and returned to the depot to put out the lights at about half past ten o'clock. It is not our purpose, nor is it necessary, now to determine what the defendants should have done in the exercise of reasonable care. All we do hold is that if from the evidence it appeared that the plaintiff was in such a drunken and sodden condition that he was unable to take care of himself, either by walking to Ft. Dodge, eight miles distant, as it is claimed he started out to do, or to obtain reasonable shelter from the inclemency of the weather, and if the defendants, knowing him to be in such condition, compelled him to leave the depot and thereby expose himself to the dangers of an extremely cold night, instead of allowing him to remain in the depot until it was finally closed for the night or longer or assisting him to some place where he might be sheltered from the cold and therein they failed to pursue the course which an ordinarily prudent man would have under like circumstances, then they are liable. The instructions of the district court were in harmony with the rules as stated, and we think were correct.

III. Some time after the accident the defendant's claim agent called upon the plaintiff, and asked him questions, which he answered, and these were taken down in 3. EVIDENCE: shorthand, and subsequently transcribed by admissions. a stenographer. The plaintiff read over and signed the translation. Many of these answers were inconsistent with plaintiff's testimony on the trial, and the

transcript of questions and answers as signed by him was offered in evidence. An objection that his attention when a witness had not been called to portions of these in cross-examination, and that it was not proper for impeaching purposes, was interposed and sustained. As the transcript was offered as disclosing admissions by the plaintiff, a party to the suit, it was admissible as substantive evidence, and it was unnecessary to first direct his attention thereto. The ruling was erroneous.

IV. The agent, Evans, testified that, when plaintiff left the depot, he walked with him as far as the elevator, and that on the way he said to him: "You are a stranger to me. I don't know you, but you can go home with me. You can stay at my house. We have two beds that are not used—nobody sleeps in them at all. You are perfectly welcome to one, and it won't cost cost you a cent." And he went off. He said, "I can walk to Ft. Dodge, just as well as not." If this occurred and plaintiff understood the offer and declined it, then defendants did all required of them. If he did not understand, and the agent was aware he did not, then, of course, this tender would not relieve them from any liability otherwise incurred.

4. RAILWAYS: ejection of passenger from station: excuse: evidence.

The plaintiff testified that he knew of nothing which happened from shortly after he had left Ft. Dodge until the following morning, so that whether he understood was fairly in issue, but it is said that there was no evidence tending to show that the agent might have been aware of this. Powers testified that the agent spoke to plaintiff four or five times in the depot, and received only a mumbling response of "wait a minute," and that he finally got him out of the depot by taking him by the collar. Ferguson testified that, after the agent came back from the elevator, he asked him what had become of the man, and the answer was that he did not know, guessed he had gone to Ft. Dodge, and said he told him the way up, and that

there was no place to stay in Evanston; that the witness said it was a pretty cold night to have to be out in his shape, and the witness responded that he would not have the drunken pup around; that he insisted upon him going out of the depot, though he did not want to go, and argued with him; and that he told him several times to go, and finally took him by the collar and led him out. This evidence was sufficient to carry the issue to the jury both as to whether the offer was made, and, if made, whether the agent knew whether it was understood by the plaintiff. There are some other rulings complained of, but of a nature not likely to occur on another trial.

Because of the errors pointed out, the judgment is *Reversed.*