**INDIAN TOWING COMPANY,**
Incorporated

v.

**THE Tankship LYONS CREEK.**

No. 2953.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 21, 1960.

Deutsch, Kerrigan & Stiles, Cornelius G. Van Dalen, Christopher Tompkins, New Orleans, La., for libelant.

Terriberry, Rault, Carroll, Martinez & Yancey, Alfred M. Farrell, Jr., New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

The foregoing matter having been tried to the Court without a jury, the Court having heard evidence and the arguments of proctors, and having taken time to consider the matters, hereby makes the following findings of fact and conclusions of law:

### Findings of Fact

1. At all material times libelant, Indian Towing Company, Incorporated, was the owner of the Tug *Comanche*.

2. At all material times, claimant-respondent, Trinidad Corporation, was the owner of the Tankship *Lyons Creek*.

3. The *Comanche* was a 500-hp, single screw diesel tugboat, having a length of 54 feet and a beam of 17 feet. Her engine is pilothouse controlled.

4. The *Lyons Creek* is a 6000-hp turbo-electric tankship of the T–2 class. She is 524 feet in length overall, with a beam of 68 feet.

5. On March 4, 1956, the *Comanche* departed Baton Rouge, Louisiana, bound downstream in the Mississippi River for New Orleans, en route to Mobile, Alabama. She was pushing a tow consisting of the loaded tank barges *KY–17* and *KY–18* made up in tandem, stern-to-stern, the *KY–18* being the lead barge. Each barge was 195 feet in length, 45 feet in beam, 9 feet in depth and loaded with 9,000 barrels of petroleum products. Each had a freeboard of about two feet amidships and about three feet at the bow.

6. The Mississippi River was then within three days of reaching its peak or "crest". The current, between 4 and 5 miles an hour, was approaching its maximum force, and traffic lights were in operation at Algiers Point. Visibility was good; an easterly wind of about 15 miles-per-hour prevailed.

7. The *Comanche* was faced up to the headlog of the *KY–18* in the following manner; two parts of 5 inch manila line led from the Comanche's bow bitts to the stern bitts on each side of the *KY–18*, serving as "jockey" or safety lines. One part of 1-inch wire cable, with its eye splice on the barge's stern bitts, led to a winch amidships on each side of the *Comanche*. In addition, 1-inch wire with its eye splice on the *Comanche's* stern bitts led to the port and starboard stern bitts of the *KY–18*, made taut with ratchets.

8. At approximately 10:15 p. m. on March 4, the *Comanche* flotilla arrived in the vicinity of Avondale Bend several miles above the Huey P. Long Bridge. The tow was handling well and all towing gear was secure. The *Comanche* was displaying proper red and green running lights atop her pilothouse and two red lights in a vertical line astern in accordance with the Western River Rules then in effect. The lead barge, *KY–17*, carried red and green running lights on her port and starboard bow, respectively, and an amber light in the center. These lights were powered by batteries which had been renewed on that very night.

9. As the *Comanche* emerged from Avondale Bend, favoring the west side of the river, her master, Captain Murrell, who was at the wheel, sighted an upbound sea-going vessel some two miles below the Huey P. Long Bridge, apparently shaping up to pass beneath the west span of the bridge. Captain Murrell adjusted course to port, toward the middle of the river, and began to shape up to pass beneath the east span of the bridge. He reduced engine speed to half ahead in anticipation of encountering wave wash from the approaching ship.

10. The upbound vessel, which proved to be the Tankship *Lyons Creek* bound for Norco, Louisiana, in ballast, passed beneath the west span of the bridge at approximately 10:23 p. m.

11. During this time, the Tugboat *San Bernard*, with a quarterboat in tow, was heading downstream making good a speed of 12 to 14 miles-per-hour over the ground, and was preparing to overtake the *Comanche* to port. That vessel was showing white towing lights in a vertical line and red and green running lights on each side of the pilothouse. Her range light was some 22 feet above the water, and her running lights were 15 to 16 feet above the water. The quarterboat, made fast with manila lines on the starboard hip of the *San Bernard*, had a green light on her starboard bow and an amber light on her port bow about 10 feet above the deck.

12. As the *Lyons Creek* cleared the west span of the bridge, the *Comanche* was approximately one and one-eighth miles above the bridge and navigating slightly east of midstream, approximately 500 feet to the eastward of the *Lyons Creek's* course line. The *San Bernard* tow was approximately 250 feet to port and astern of the *Comanche*.

13. The *Lyons Creek* continued to come on without reducing speed, and at 10:25 p. m., at a point approximately one-half mile above the bridge, she passed the *Comanche* starboard-to-starboard, less than five hundred feet off, at full ahead.

14. Just after the *Lyons Creek* passed, the *Comanche* encountered heavy wave wash and turbulence. Waves washed over the decks of her barges and set up severe stresses on the *Comanche's* face wires.

15. As a result of this wave wash action, the *Comanche's* starboard towing gear was caused to part, and she lost control of her tow in the swift current. Her master put the engines full astern in an effort to regain control at least sufficient to prevent the flotilla from striking the bridge pier. Sternway could not be gathered in time to make this maneuver effective, however, and the *Comanche* was swept downstream at an angle toward the abutment of the bridge.

16. Captain Murrell immediately ordered the engineer on watch to alert the crew. He attempted to free the tug from her barges by chopping the port towing line, but was unable to do so in time. The face barge, *KY–18,* struck the abutment and immediately thereafter, the tug herself struck the pier. The remaining wires and lines parted, and the *Comanche* rolled over to port and capsized as her barges drifted freely downstream. All four of her crew members leaped into the river, but only the master and mate survived.

17. The *San Bernard* had begun to overtake the *Comanche,* about 250 feet to port, and the head of her tow was opposite the *Comanche's* stern as the *Lyons Creek* passed the *Comanche.* Thus, the lookout on the bow of the quarterboat in tow of the *San Bernard* had a clear view of the river. He saw waves wash over the barges in the *Comanche's* tow. He watched them rise and fall in the swells before the turbulence struck the quarterboat causing it to pitch heavily, and the *San Bernard* to "bounce up and down," causing her pilot to slow the vessel to half speed in order to protect the manila lines.

18. After passing the *Comanche,* the *San Bernard* engines were put full ahead again, and she continued toward the bridge. Her deckhand looked astern around the high superstructure of the quarterboat and saw the running lights of the *Comanche's* lead barge, unaware of the *Comanche's* difficulty.

19. The master of the *Lyons Creek* was on the port wing of the bridge at all material times, but did not see either the *Comanche* or *San Bernard* tows and could not recall even having looked to starboard in the vicinity of where those flotillas were. Neither did the third mate, the pilot, the bow lookout or anyone else aboard the *Lyons Creek* see those vessels.

20. It was stipulated between the parties that on the night of March 4, the *Lyons Creek* averaged 11.8 statute miles-per-hour over the ground at a full ahead harbor speed of 80 r.p.m. The vessel's speed chart shows that she makes a speed of 13.8 knots or 15.8 statute miles-per-hour at 80 r. p. m. in still water. Accordingly, the *Lyons Creek* was proceeding through the water at a speed of at least 15.8 statute miles-per-hour on full ahead (80 r. p. m) against the 4 to 5 mile current which prevailed when she passed the *Comanche.*

21. Both before and after the casualty the *Lyons Creek* had reduced her speed to half ahead when passing other vessels that night, and those in charge of her navigation testified that they would have slowed to half ahead had they been aware of the presence of the *Comanche* or the *San Bernard.*

## Conclusions of Law

1. This court has jurisdiction of the action, and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333).

2. The Tankship *Lyons Creek* passed the *Comanche* at an excessive rate of speed, too close aboard, and her wave wash caused the *Comanche's* tow to break up and go out of control. It is well es-

tablished that excessive speed in a crowded waterway saddles liability for damage caused thereby on the offending vessel. Dufrene v. The Diversity, D.C.La., 163 F.Supp. 331, 1958 AMC 1953 and cases cited therein. The Columbia, 3 Cir., 1894, 61 F. 220, 221; The Monmouth, D.C.S.D.N.Y.1891, 44 F. 809; The Chester W. Chapin, D.C.E.D.N.Y.1907, 155 F. 854; The Majestic, 2 Cir., 1891, 48 F. 730; Lowery v. Hudson River Day Line, Inc., D.C.E.D.N.Y., 132 F.Supp. 629, 1955 A.M.C. 1571; The Hendrick Hudson, D.C.E.D.N.Y., 3 F.Supp. 317, 1933 A.M.C. 120; The Duchess of York, D.C.S.D.N.Y., 1935 A.M.C. 545; The President Roosevelt, D.C.E.D.N.Y., 1931 A.M.C. 1076; The Dewitt Clinton, D.C.E.D.N.Y., 1928 A.M.C. 990. Accordingly, a vessel which sees, or should see, other vessels, whether moored or navigating, in a position where damage to such vessel from her swell is foreseeable, must reduce her speed or direct her course away from them. The Lyons Creek did neither. She failed to see the San Bernard or the Comanche to starboard in close proximity; she directed her course toward the unseen vessels and maintained her speed in excess of 15 miles-per-hour through the water despite the fact that her master and pilot considered it mandatory, and in fact had made it a practice, to slow down when meeting or overtaking a tow in the river.

3. Those in charge of the Lyons Creek's navigation did not keep a proper lookout. Article 29 of the Inland Rules, 33 U.S.C.A. § 221. Nobody aboard the Lyons Creek saw the downbound Comanche flotilla or the San Bernard and tow despite the fact that those vessels were well-lighted. The Comanche was displaying proper lights. The red, amber and green running lights were displayed on her lead barge although it was conceded that they were less than the prescribed eight feet above the water. The San Bernard was showing bright white towing lights and green and red running lights. Her range light was some 22 feet above the water and her running lights were 15 to 16 feet above the water.

4. Despite the niceties of claimant's simulated tests and the speculative hindsight of expert witnesses (each one of whom holds a different view), the testimony of fact witnesses shows that the Comanche, with her tow properly rigged, and proceeding with caution, experienced wave wash from the Lyons. Creek which parted her towing lines, causing the flotilla to go out of control so that boat and barges were swept downriver at the mercy of the current toward the concrete bridge piers. The France, D.C.E.D.N.Y., 1929 A.M.C. 1585; The Dewitt Clinton, D.C.E.D.N.Y., 1929 A.M.C. 990; The President Roosevelt, D.C. E.D.N.Y., 1931 A.M.C. 1076; Dufrene v. The Diversity, D.C., 163 F.Supp. 331, 1958 A.M.C. 1953.

5. The Comanche was free from fault.

a—Expert testimony showed that the Comanche was properly secured to her tow in accordance with standard practice for pushing loaded barges on inland waters, and she was amply powered for the size and type of tow she had in custody.

b—The Comanche flotilla had navigated the high river for some 90 miles without difficulty. Her master reduced speed, as he should have done, and prepared to pass the Lyons Creek at a proper distance. Despite these precautions, the Lyons Creek drew closer to the Comanche and her swells were sufficient to part at least two face wires, and two 5-inch manila jockey ropes.

c—The actions of the Comanche's master were all that could be expected of the average reasonable tug master in similar circumstances. His natural thought was to back the engines to prevent his barges, with their volatile cargo, from striking the bridge piers, or at least to take sufficient headway off the runaway tow to reduce the possibility of disaster. In view of the expert testimony, it is doubtful that the Comanche's master made any error in these circumstances, but, if he did, it was simply one in extremis and, accordingly, excusable. The Yacht Car-

oletta-Betty K II, D.C.S.D.Fla., 1958 A.M.C. 523; The Evelina-Edward T., 5 Cir., 243 F.2d 401, 1957 A.M.C. 726.

d—There being no causal connection between the position of the running lights on the *Comanche's* lead barge and the *Lyons Creek's* failure to see the two downbound tows, the fact that those lights were less than eight feet from the water is not material. Smoot Sand & Gravel Corp. v. Baltimore Steam Packet Co. (The Virginia), 102 U.S.App.D.C. 97, 250 F.2d 422, 1958 A.M.C. 44, 47.

6. Sole fault for the damages arising out of the sinking of the *Comanche* lies with the *Lyons Creek,* and libelant is entitled to a full recovery therefor.