Ora BYRD, Libelant,

v.

C. W. BELCHER, Respondent.

No. 3388.

United States District Court
E. D. Tennessee, S. D.

April 2, 1962.

Atchley & Atchley, Chattanooga, Tenn., for libelant.

L. D. Miller, Jr., Chattanooga, Tenn., for respondent.

C. G. NEESE, District Judge.

Ora Byrd (Frisbee) brings this action as the surviving widow of Carl Byrd for her said decedent's alleged wrongful death by drowning on Chickamauga Lake on December 23, 1957. The tragic accident occurred at about 5:00 o'clock, p. m., in the vicinity of Harrison Bay Boat Dock in Hamilton County, Tennessee, allegedly resulting proximately from the negligent operation of a boat by the respondent, C. W. Belcher.

While the testimony offered on behalf of the libelant was burdened with numer-

ous and often glaring inconsistencies and contradictions, the Court finds that the following is a reasonably accurate account of the facts established:

The libelant's decedent, the libelant herself, and Mr. and Mrs. Charles W. Alvis, sister and brother-in-law of the libelant, were passengers in a boat being operated by the decedent Byrd. The two women were riding on the center seat of the Byrd boat, Alvis was positioned in the bow of the boat, while the decedent was in the stern of the boat and operating the outboard motor.

Byrd and Alvis had put the decedent's boat in the water a short time before the accident occurred. Byrd's boat was a 14-foot aluminum craft powered with a 10- or 12-horsepower outboard motor. After a brief sally out into the Harrison Bay area, the men returned to shore and were joined in the craft by their respective wives; whereupon it was decided that the party would visit the Harrison Bay Dock area and view the larger craft lying at anchor there.

Thus, about one and a half hours after arriving at the lakeside, the Byrds and Alvises were navigating near the entrance to the boat dock area a short distance from the shore and at a speed estimated at ten to fifteen miles per hour when the boat in which they were riding capsized, apparently swamped by waves. All four occupants of the craft were thrown into the water and the libelant's decedent, Carl Byrd, was drowned.

The gist of the testimony of the three survivors from the Byrd craft was as follows:

Mrs. Byrd (now Frisbee) testified that while she had seen several boats "go down" (away from the boat dock and toward the main portion of the lake proper) during the time her husband and brother-in-law were out in the boat, she had seen no unmoored boat, other than the respondent's, from the time the trip with the ladies aboard began until the accident occurred; that just prior to the tragedy, the boat in which she was riding was overtaken from the rear by another boat; that the overtaking boat was " *   *   * yellow with a canvas top, yellow and brown, and it had two motors on it   *   *   * "; that she could not see well enough to identify them, but there were four boys in the overtaking boat, two of the boys standing up and " *   *   * looking back as they went by us"; that she did not recognize the respondent Belcher in the courtroom; that the overtaking boat passed her husband's boat within approximately twelve feet; that she did not see the overtaking boat " *   *   * until it got alongside of me"; that she noticed the overtaking boat and the first wave nearing her husband's boat at about the same time; that the first such wave half-filled her husband's boat with water, and the second wave " *   *   * just covered it over"; that the waves came from the side of the overtaking boat; that Alvis was seated on the forward seat, facing the stern of the boat; that they had life preservers in the boat but were not wearing them; that the weather was clear and the lake "reasonably calm".

Mr. Alvis testified that he was seated on the floor of the boat in the forward end, facing forward; that he did not see the overtaking boat until it had passed; that he threw up his hand in greeting to the two boys standing in the stern of the passing boat; that " *   *   * at that time the wave come (sic) over the boat and knocked my wife into the back of the boat, and the next wave flipped us"; that the " *   *   * wake from the boat   *   *   * " created the waves which caused the Byrd boat to capsize; that the overtaking and passing boat had a convertible top and was brown and cream and was the only other boat he saw navigating on the lake that afternoon; that he estimated the speed of the overtaking boat at between twenty-five and thirty miles per hour, and although it was difficult to judge the distance, the other boat passed within one hundred feet of the Byrd boat and created " *   *   * the biggest wake I had ever seen on a boat"; and that he was " *   *   * sure they went off and left us." On direct exam-

ination, when asked how far they were from the shore, Mr. Alvis responded: "At the time we flipped?" When shown a picture of the respondent's boat and asked: "Is this a picture of the boat, or a boat similar to it?" he replied, "It doesn't look like the same boat." On cross examination Mr. Alvis positioned the women facing the stern of the boat, the direction from which the overtaking boat approached the Byrd boat. He also stated that he waved " * * * after they passed. * * * I didn't realize there was such a wake at the time, until it hit us."

Mrs. Alvis testified that the boat which overtook and passed the boat in which she was riding was the same type of boat as that shown in a photograph of respondent's boat which was shown her for identification purposes; that the overtaking boat passed the Byrd boat about fifty feet away (although on cross examination she placed the two boats at no more than fifteen feet apart when the Byrd craft capsized); and she conceded that, because of an injury, her memory is not good.

The respondent's evidence in chief tended to show that on the same date, and at or near the same place at approximately the same time, the respondent, C. W. Belcher, his brother-in-law (now deceased), his son Walter Belcher, and his nephew Carl Perry, were riding on the lake in the respondent's 1957 model 16-foot, 7 inch Thompson lap-strake runabout boat powered by two 35-horsepower outboard motors; that respondent had been out into the lake proper and was returning toward Harrison Bay boat dock with the respondent at the wheel on the starboard side, the late Mr. Perry riding to respondent's left in the front of the craft, and the two boys, each then fifteen years old, seated or crouched near the stern of the Belcher boat.

Respondent Belcher testified that his boat was navigating at about half-throttle, an estimated speed of about fifteen miles per hour, and was planing; that he overtook and passed another and smaller boat to starboard; that he never at any time came closer to the other craft than five hundred to six hundred feet; that he knew nothing of the alleged swamping or capsizing of another craft or of the death of the libelant's husband until the following day; that he was able to estimate, on the basis of his experience in operating motorboats, that it would require from one and a half to two minutes for waves from the wake of his boat to reach the boat he overtook and passed on the occasion in question; that waves from the wake of boats are reduced when a boat is planing on the surface of the water as he testified his craft was doing at the time it overtook and passed the other craft; and that the lake was "rough".

The respondent's son, Walter Belcher, testified that he saw no other craft navigating on the lake during that entire afternoon while he was riding in his father's boat, and that the lake was "choppy" and it was "cold". His cousin Carl Perry testified that he saw another boat on the afternoon of their pleasure ride about five hundred to six hundred feet away from the boat in which he was a passenger but saw nothing unusual at any time.

In rebuttal to the testimony of Alvis, a newspaperman who had interviewed him shortly after the accident (within an hour to one and a half hours and before Alvis had left the boat dock following his rescue) testified that Alvis had told him that the other craft " * * * didn't come very close to us"; that he didn't know whose boat it was that passed the small boat, but that it had "twin red outboard motors, was a dark color, had a canvas convertible type top and that there appeared to be four or five young men aboard." The newspaperman also testified that Alvis had told him during the interview that "Carl (Byrd) didn't seem to notice the big wave rolling toward us, so I motioned to him to head toward it, but he didn't do it, and before we knew it, it rolled right over us."

■■■ This is an admiralty action under the general maritime law which al-

lows no suit to recover damages for the wrongful death of a human being caused by the negligence of another. Western Fuel Company v. Garcia, 257 U.S. 233, 240, 42 S.Ct. 89, 66 L.Ed. 210. However, where death results from a maritime tort committed on navigable waters within a state, if the statutes of that state give a right of action on account of death by wrongful act, admiralty courts may entertain a libel *in personam* against the respondent alleged to have proximately caused such death. Levinson v. Deupree, 345 U.S. 648, 650–651, 73 S.Ct. 914, 97 L.Ed. 1319. Tennessee has such a wrongful death statute, T.C.A. section 20–607, et seq., so this court of admiralty entertains jurisdiction. Spencer Kellogg & Sons, Inc. v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903. The action is governed by the principles of the common law. Robinson v. Detroit & C. Steam Nav. Co., (C.A., 6th Cir.) 73 F. 883, 894. Under the common law in Tennessee where contributory negligence proximately contributes to the injury, the recovery of the libelant is completely barred. Atlantic Coastline R. Co. v. Smith, (C.A., 6th Cir., 1959, Tenn.) 264 F.2d 428, 432.

One operating a boat who sees, or should see, another boat, whether moored or navigating, in a position where damage to such other boat from the swell or wave wash from the first boat is foreseeable, must reduce speed and direct the course of the first boat away from the position of the second boat. Indian Towing Company v. The Lyons Creek (D.C. 1960), 187 F.Supp. 774, 777; Trinidad Corp. v. Indian Towing Co., 5 Cir., 293 F. 2d 107. " * * * (W)henever one person is by circumstances placed in such a position with regard to another that everyone of ordinary sense * * * would at once recognize that, if he did not use ordinary care and skill in his conduct with regard to those circumstances, he would cause danger of injury to the person * * * of the other, a duty arises * * * to avoid such danger." Hutchinson v. Dickie, C.A.6th Cir., 162 F.2d 103, 106, citing Carey v. Davis, 190 Iowa

720, 180 N.W. 889, 891, 12 A.L.R. 904, quoting from Adams v. Chicago Great Western R. Co., 156 Iowa 31, 135 N.W. 21, 42 L.R.A.,N.S., 373.

The Court finds and concludes that the libelant Ora Byrd (Frisbee) has offered sufficient evidence to support a right of action against the respondent Belcher. However, a careful review of all the evidence demonstrates the following weaknesses in libelant's proof:

Inadequate identification: Mrs. Byrd testified she had seen "several boats go down" and had not seen any boat return to the boat dock area before the craft which allegedly capsized the Byrd boat; she said the offending craft was "yellow and brown" while her witness Alvis upon the trial said it was "cream and brown", although his report to the newspaper reporter immediately after the accident described the other craft as of "dark color" and did not suggest that it was "two-tone". When on direct examination Alvis was shown a picture of respondent's boat by the proctor for the libelant and asked if this was a picture of the offending boat he replied: "It doesn't look like the same boat." Libelant could not identify respondent as the operator of the offending boat but said there were four boys in the craft causing the injury, and in this she was substantiated by her witness Alvis, who said two boys were standing in the stern. On the other hand the respondent's proof tends to show that while there were four persons aboard his craft, two were men and the two boys at the stern were seated or crouching.

Proximate cause: Libelant stated the offending boat passed within some twelve feet of the Byrd craft; Alvis said within about one hundred feet; while Mrs. Alvis said within fifty feet on direct examination and then on cross examination only fifteen feet. Respondent's proof was that he had seen and passed a small craft but was never closer to it than some five hundred to six hundred feet, and that Alvis's statement to the newspaperman was to the effect that "the other craft didn't come very close to us." Libelant's

proof tended to show the lake was "reasonably calm" while respondent's proof was to the effect that the lake was "rough and choppy". Alvis testified that he saw a huge wave approaching the boat in which he was seated and the newspaperman quoted Alvis as having said Byrd did not notice it so "I motioned for him to head toward it, but he didn't do it." Mrs. Alvis stated that she "saw the big wave coming" toward them. But it was stated by libelant that she noticed the wave and the boat passing them at "the same time, almost", and that the capsizing followed immediately thereafter. The respondent's proof was to the effect that his boat was planing, leaving only a reasonable wake, and that it would require more than a minute for the wave his boat was creating to reach the small craft he passed.

Contributory negligence: While a consideration of the defense of contributory negligence is not necessary to a determination of this case, the Court observes that at least two items would have to be considered should the Court find the respondent negligent, namely (a) the fact that none of the passengers in the Byrd craft had on life preservers, and (b) the question of whether the libelant's decedent was contributorily negligent in not turning the bow of his boat so as to meet the oncoming wave after Alvis had motioned for him to head toward it.

Under all the circumstances brought out on the trial of this cause, the Court, as the trier of the facts, could not rest a judgment for the libelant on anything more than mere speculation and conjecture. Judgments and decrees thus founded are improper and will be reversed. See: Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819.

Accordingly the Court finds in favor of the respondent Belcher and will enter a judgment accordingly upon submission of a proper order by the proctor for the respondent. This opinion shall serve as the required findings of fact and conclusions of law herein.