**Donald I. ROGERS, Owner of the MOTOR CRUISER NANCY LYNN and Marjorie R. Rogers, Libellants,**

v.

**TALLMAN & MACK FISH AND TRAP CO., Inc., Respondent.**

No. 1823.

United States District Court
D. Rhode Island.

Sept. 24, 1964.

J. Frederick Murphy, Pawtucket, R. I., Horace T. Atkins, New York City, for libellants.

Salvatore L. Virgadamo, Newport, R. I., Owen P. Reid, Edward J. Regan, of Graham, Reid, Ewing & Stapleton, Providence, R. I., for respondent.

DAY, District Judge.

This proceeding in admiralty arises out of an incident which happened on July 26, 1959 in the West Passage, so-called, of Narragansett Bay, in the State of Rhode Island, when the Motor Cruiser Nancy Lynn struck a floating fish trap located therein which was owned and maintained by the respondent, Tallman & Mack Fish and Trap Co., Inc.

The libellant, Donald I. Rogers, the owner of said motor cruiser, seeks to recover herein for damages to said cruiser and her equipment, for the loss of and damage to personal effects aboard said cruiser and for the loss of the services of his wife, Marjorie R. Rogers, the other libellant, and for medical expenses incurred by him in the treatment of injuries sustained by her as a result of said incident. Marjorie R. Rogers seeks damages for personal injuries sustained by her. The respondent in a cross-libel seeks to recover the cost of repairs to its fish trap and damages for the loss of the use thereof while such repairs were being made.

The evidence established that for many years prior to 1959 the Chief of Engineers of the Army had designated certain locations in Narragansett Bay as fish trap areas. These areas have been designated as such on charts prepared by the Coast and Geodetic Survey of the United States Department of Commerce which indicate the boundaries of said areas by a series of broken lines in red ink. As of December 31, 1958, the respondent was granted a renewal license by the State of Rhode Island to maintain two fish traps, 74A and 74B at the location described therein, in a fish trap area designated by said Chief of Engineers on the westerly side of said West Passage. These traps were installed by the respondent about June 5, 1959, and one of them was struck by said Nancy Lynn on July 26, 1959.

In support of their claims for damages libellants contend that said fish traps constituted unlawful obstructions to navigation in that they extended beyond said designated fish trap area and were not suitably marked. The respondent contends with equal vigor that said traps were located within the fish trap areas designated on said charts and were suitably and properly marked.

The crucial issue here is—where did the collision between said motor cruiser and said fish trap take place? The testimony as to this issue and as to whether the inshore or offshore trap was struck is in irreconcilable conflict.

The evidence established that the incident involved herein occurred about 5:15 P.M. on July 26, 1959. According to the libellant, Donald I. Rogers, the day was bright and sunny, his visibility was unlimited and there was a slight chop to the water. He testified that he had left Fall River earlier in the afternoon and was enroute to Mystic, Connecticut; that he was aware of the existence of the fish trap area on the westerly side of said West Passage and had therefore charted and was following a 215° course from Whale Rock southerly to the Whistling Buoy located southeast of Point Judith, a course which lay eastward of the outer limits of said fish trap area, and that he was maintaining a proper lookout at all times. He further testified that as he was following said course he suddenly observed what appeared to him to be a brown barrel on the port side of his cruiser and that he saw no other barrels; that he "practically ignored it"; that suddenly he saw in front of the bow of his cruiser what appeared to be a submerged cable and that despite his efforts the Nancy Lynn ran upon it and was disabled. He also testified this occurred at a point between three quarters of a mile and a mile offshore and east of the outer boundary of said fish trap area. As soon as the cruiser became disabled, the passengers aboard, including Marjorie R. Rogers, went overboard and were subsequently rescued. Rogers sent out a distress call for the Coast Guard which responded promptly and towed the Nancy Lynn to safety.

Under cross examination he admitted that in a written report filed by him on August 20, 1959 with the Coast Guard, he stated that at the time of the collision he was "on a direct compass course from Whale Rock, Beavertail, to Point Judith". He also admitted that in said report he stated that the fish trap which his cruiser struck "lies on the direct and normal course from Whale Rock to Point Judith".

Thomas P. Swift, who had been in Fall River with the libellants, testified that he was following the Nancy Lynn down the West Passage in his cruiser, the

Carol Ann. His destination was likewise Mystic, Connecticut. In describing his course which he stated to be 215°, he testified that he was following the Nancy Lynn on her port side by about 1500 feet, and that his vessel had passed Whale Rock on her port side. He testified that he saw the Nancy Lynn suddenly lurch to starboard and stop. At this time his craft, the Carol Ann, was, according to him, about 3,000 feet from shore and in waters which were 64 to 70 feet in depth.

Edward G. Bell, 3rd and James Butterfield, Jr., who as members of the Coast Guard, responded to the call for help by Rogers testified in substance that when they arrived at the scene of the collision the Nancy Lynn was about three quarters of a mile from shore and was caught in the offshore trap of the respondent.

Other witnesses called by the libellant testified that in May and June, 1959 they had been sailing a 215° course in the vicinity of said fish trap area and that they had observed brown barrels in the water and had then steered to the east off their courses to avoid them. None of these witnesses identified or attempted to identify the barrels observed by them as those connected with defendant's traps.

In support of respondent's contention that its traps were located in accordance with its license and suitably marked, George Mendonsa, a veteran employee of the respondent, who installed said traps in June, 1959, testified as to their dimensions and locations. He testified that the frames and leader lines of said traps were supported by barrels which had been freshly painted Oriental orange when installed. Additionally said frames and leader lines thereto were supported by numerous plastic floats painted Oriental orange or brown, arranged in clusters of three and spaced about 15 inches apart. The frames and leader lines were secured in their respective positions by a total of 39 anchors, the location of each of which was marked by a float 4 feet long and approximately 10 inches wide which was painted International copper.

He further testified that the inshore trap was supported by 16 barrels, and the offshore trap by 15 barrels. These barrels which were 3½ feet high with diameters varying from 20 to 30 inches had capacities of from 50 to 55 gallons, were air tight and floated. He described in detail the dimensions and locations of each of said traps and the leader lines as installed by him in June, 1959. He also testified that the leader line of the inshore trap, 74A, began at a barrel located approximately 600 feet easterly from the shore line and that the offshore trap, 74B, with its leader line was located entirely within said designated trap area.

He further testified that on the evening of July 26, 1959, he received a telephone call from a fisherman who had since died to the effect that the leader line to the respondent's inshore trap had been damaged on that date. Acting upon this information, he went early the next morning to inspect the respondent's traps accompanied by a fellow employee, one Charles Rosinha. He testified that he and Rosinha found that the leader line to the inshore trap had been damaged at a point which was between 1300 and 1400 feet from the shore, that their inspection disclosed that neither the offshore trap nor its leader line had been damaged in any way and that he removed a quantity of fish from the latter trap. He also testified that a boat following a charted course from Whale Rock to Point Judith would pass through said designated fish trap area.

His testimony as to the location of the damage to the leader line of said inshore trap was corroborated by Rosinha who also testified that he assisted in removing said line from the water, that he made the necessary repairs thereto and assisted in its re-installation several days later.

Morton L. Blasbalg, who had arrived at the scene of the accident prior to the crew of the Coast Guard and rescued said passengers of the Nancy Lynn, testified that after an afternoon of fishing off Scarborough Beach and Narragansett Pier he was a passenger in a boat sailing

in a northerly direction up said West Passage toward said fish trap area; that the boat on which he was riding was about a quarter of a mile offshore when he noticed the Nancy Lynn which was inshore of his boat and appeared to be stopped. He further testified that shortly thereafter, upon approaching the Nancy Lynn, he discovered that several persons were in the water in the fish trap area. After describing his actions in rescuing them he stated unequivocally that the Nancy Lynn was caught on the leader line of the inshore trap at a point that was not more than 1500 feet from shore. He also testified that he saw the libellant, Donald I. Rogers, later that evening and discussed the incident with him; that the latter then told him that prior thereto he had been proceeding down the West Passage on a compass course from Whale Rock to Point Judith; that just before the Nancy Lynn became caught on the fish trap he noticed a barrel on her port side and another barrel on her starboard side; that he "didn't think anything of it" and "just proceeded between them" and the next thing he knew "he was hung up on this net".

The respondent also presented testimony to the effect that the brown barrels which witnesses for libellants had testified they observed in the vicinity of said fish trap area, and avoided prior to July 26, 1959 while proceeding on a 215° course, belonged to the John F. Mack Fish Co. which was no longer in business but which had, prior to 1959, maintained a fish trap in a location north of respondent's fish traps and that they were removed from the water in late August or early September, 1959.

As hereinbefore pointed out, the crucial issue in this case is—where did the collision between the Nancy Lynn and said fish trap take place? Did it occur within the designated fish trap area or beyond the outer limits thereof?

After a careful consideration of all of the evidence and the reasonable inferences to be drawn from it, I find as a fact that the Nancy Lynn struck the leader line of respondent's inshore trap at a point within 1500 feet from the shore line in said designated fish trap area. I regard as accurate and true the testimony of Morton L. Blasbalg, who appeared to be a completely disinterested witness, that said leader line was struck by the Nancy Lynn at that point. I also regard as true his testimony as to the statements made to him by Donald I. Rogers as to the course he was following when the Nancy Lynn struck said line, and his observations and actions immediately prior thereto. In this connection, it is to be noted that Rogers stated he was following a course from Whale Rock to Point Judith in his report to the Coast Guard less than a month after July 26, 1959, and it is clear from the testimony and Chart 1210 prepared by the United States Department of Commerce (libellant's Exhibit 3) that a course from Whale Rock to Point Judith would run through the designated fish trap area. I am also satisfied from the testimony of said employees of the respondent that it was the leader line of said inshore trap which was damaged by the Nancy Lynn and that no part of the offshore or outer fish trap was struck by the Nancy Lynn. I also find that said fish traps were properly located in accordance with the terms of said license issued to respondent and were suitably marked.

In summary, I find that libellants have failed to establish any fault or negligence by the respondent either in the location or the maintenance of its traps that caused said collision.

While it is true, as the libellants contend, that the right of navigation in Narragansett Bay is paramount to that of fishing, a navigator may not, by his own negligence, unnecessarily force those two rights into conflict and then claim the benefit of the paramount right. Agger v. The Beatrice and Rose, D.C.1949, 84 F.Supp. 761; Wright v. Mulvaney, 1890, 78 Wis. 89, 46 N.W. 1045, 9 L.R.A. 807. Here the libellant, Donald I. Rogers, was navigating his cruiser in a fish trap area, the existence of which he claims was known to him. Although he admitted that just prior to

the collision he saw at least one barrel in the water, he in effect said that he paid no attention to it. The day was bright and sunny. According to his testimony his visibility was unlimited and he had an unobstructed view of the area in front of his cruiser. Under the circumstances, the conclusion is inescapable that he was negligent in failing to maintain a proper lookout that would have revealed the presence of said fish traps which in the exercise of due care he could easily have avoided. In my opinion his negligence was clearly the proximate cause of said collision and he is liable for the damages sustained by the respondent as a result of his negligence.

In conclusion, I find that the libellants are not entitled to relief and that their libel should be and is dismissed. I also find that the respondent is entitled to relief. Counsel for the respondent will prepare and present for entry an appropriate decree dismissing said libel and providing for reference to a commissioner under Rule 43 of the Rules of Practice in Admiralty and Maritime Cases to ascertain and report to this Court the amount which the respondent is entitled to recover as damages.