GREAT AMERICAN INSURANCE COM-
PANY a/s/o Oyster Bend Marina and
William Lindwall, Plaintiffs,

v.

TUGS "CISSI REINAUER," "Leigh Ann
Reinauer," Their Engines, Boilers, etc.,
and the Barges "RTC 330," "Fulton,"
and "Peter R. Hearne," Their Boilers,
etc., and Reinauer Transportation Com-
panies, Inc., Defendants.

No. 94 Civ. 8451 (LBS).

United States District Court,
S.D. New York.

Aug. 8, 1996.

Badiak, Will & Maloof, New York City (James P. Krauzlis, of counsel), for plaintiffs.

Kenny & Stearns, New York City (James M. Kenny, Gino A. Zonghetti, of counsel), for defendants.

SAND, District Judge.

Plaintiffs, the insurer of the Oyster Bend Marina ("the Marina") and William Lindwall ("Lindwall"), owner of a houseboat, brought this action to recover for property damage caused by tugboats and barges owned and operated by defendant Reinauer Transportation Companies ("Reinauer"). After consideration of the evidence presented at a five-day bench trial, the Court, for the reasons set forth below, finds for defendants on all claims.

## BACKGROUND

### A. THE PROJECT

The Oyster Bend Marina Project ("the Project") is a real-estate venture located on one of two sharp turns along the Norwalk River in East Norwalk, Connecticut. The Project includes thirty-six condominiums that abut a marina comprised of eighty marina slips. Tr. at 56. The owner of the Marina, Richard Scalise, Sr. ("Scalise"), hoped that

individuals interested in purchasing the thirty-six condominiums would enjoy recreational boating and therefore also purchase a marina slip. *Id.* Therefore, Scalise applied for and received permits from the state of Connecticut, Department of Environmental Protection, and the U.S. Army Corps of Engineers, allowing him to build a marina adjacent to the condominiums. Tr. at 23. The Marina was built in 1989, *id.*, and in July, 1994, plaintiff Lindwall rented a slip. Tr. at 135. Thereafter, Lindwall took up residence at the Marina, where he berthed his forty-six foot, 1969 Chris Craft houseboat. *Id.*

The Marina utilized bubbling devices to prevent ice from forming near the pilings so that there was clear water immediately adjacent to the piers.

During the thirteen-month period between January 16, 1994, and February 9, 1995, four incidents occurred in which tugs and barges owned by Reinauer and operated along the Norwalk River, pushed ice into the Marina, thereby causing substantial damage to docks and dolphins in the Marina and to the houseboat owned by Lindwall.

## B. THE INCIDENTS

### a. *Incident of January 16, 1994*

On January 16, 1994, at approximately 8:30 p.m., tug *Cissi Reinauer* ("*Cissi*"), under the command of Captain William Sanford ("Sanford"), entered the Norwalk River with barge RTC–330, which contained approximately 12,000 barrels of home-heating oil, in tow. The tug and barge were en route to Devine Brothers Dock ("Devine Bros."), located upriver from the Marina. At 9:30 p.m. the tug and barge, while near the Metro North Bridge, encountered ice between eight and ten inches thick. Sanford separated the tug from the barge and proceeded upriver in the tug, past the Oyster Bend Marina, to Devine Bros. In doing so, Sanford broke ice in the federal channel. Thereafter, he returned to his barge, attached it to the tug, and delivered it to Devine Bros. These maneuvers forced ice into the Marina, thereby causing substantial damage to plaintiffs' docks, pier, dolphin, and ice management equipment.

### b. *Incident of January 24, 1994*

On January 24, 1994, tug *Cissi*, under the command of Capt. Robert Markuske ("Markuske"), entered the Norwalk River with barge RTC–330 in tow, carrying heating oil to be delivered to Devine Bros. At approximately 7:00 a.m. Markuske encountered ice, between six and ten inches thick, in the vicinity of the Metro North Bridge. The United States Coast Guard vessel *Ballard*, a sixty-five foot tug boat, navigated ahead of the *Cissi* and past the Marina in an effort to help clear the ice. After the *Ballard* travelled past the Marina, breaking ice, Markuske navigated tug *Cissi*, pushing barge RTC–330 stern first, past the Marina. Plaintiffs, informed by the bridge tenders that a tug would navigate upriver on the morning of the twenty-fourth, captured on videotape the tug's attempt to pass the Marina. The tug's maneuvers forced ice into the Marina, thereby causing substantial damage to plaintiffs' pilings and piers.

### c. *Incident of February 6, 1994*

On February 6, 1994, at about 5:00 a.m., the tug *Leigh Ann Reinauer* ("Leigh Ann"), under the command of Capt. Norman Bourque ("Bourque"), entered the Norwalk River with the barge *Fulton*, laden with home-heating oil. At about 6:10 a.m. the tug and barge encountered ice approximately two to four inches thick, in the vicinity of the Metro North Bridge. Bourque navigated the tug, which was pushing the barge stern first, past the Marina to Devine Bros. Plaintiffs, armed with their video camera, witnessed the passage, which resulted in ice once again being pushed into the Marina. At 6:20 p.m. Bourque navigated the tug and barge back down river pushing more ice into the Marina. These two passings caused substantial damage to plaintiffs' docks.

### d. *Incident of February 9, 1995*

On February 9, 1995, the tug *Cissi*, captained by Sanford, with the barge *Peter Hearne* laden with home-heating oil, entered the Norwalk River, en route to Devine Bros. Upon encountering ice between four and six inches thick near the Metro North Bridge, Sanford disattached the tug from the barge

and proceeded north in order to break the ice. Sanford reached a point approximately two-hundred yards from the Marina and, after two failed attempts, decided to turn back rather than navigate further upriver. As a result of these attempts, large sheets of ice were pushed into the Marina, causing substantial damage to both the docks and the houseboat owned by Lindwall.

## C. THE DAMAGE

The damage in this case is relatively uncontested. During the first incident, on January 16, 1994, ice pushed into C dock (see exhibit 1A attached) bending pilings and breaking docks. Tr. at 220. During the second incident, on January 24, 1994, C dock experienced similar damage as did the northern-most finger pier and dolphin of A dock. At trial, Captain Olsen testified that the damages caused to C dock as a result of the first two incidents totalled $13,939, and the damage to A dock was $2,700.

During the third incident, on February 6, 1994, finger floats and pilings on A dock were broken (Tr. at 238–40). Similar damage to B dock and D dock occurred.

On February 9, 1995, during the last incident, the flotation pontoons of the main dock areas were forced from underneath the dock resulting in A dock sustaining damage. Defendant's surveyor estimated that the damages to the Marina totalled $30,000, and the damages to the Lindwall houseboat totalled $12,500. (Pl.Ex. 38 and 39).

## D. THE NORWALK RIVER

The Norwalk River is a winding river that flows in a southerly direction from the town of Norwalk, Connecticut, through Norwalk Harbor, and empties into the Long Island Sound. The Norwalk River is described in the U.S. Coast Pilot ("the Pilot") as a navigable river comprising two sections: the section south of the Metro North Bridge, which passes the town of South Norwalk, and the section north of the Metro North Bridge, which leads to the town of Norwalk. Def.Trial Ex. KK ("Def.Ex.").

■ A river is considered "navigable" if it is capable of being used by the public for the purposes of transportation and commerce. *Pitship Duck Club v. Town of Sequim*, 315 F.Supp. 309 (D.C.Wash.1970); *Alabama Power Co. v. Gulf Power Co.*, 283 F. 606 (D.C.Ala.1922); *see also Cardwell v. American Bridge Co.*, 113 U.S. 205, 5 S.Ct. 423, 28 L.Ed. 959 (1885). Navigability does not depend on there being no occasional difficulties in navigation, as long as the river, in its natural and ordinary condition, affords a channel for commerce. *Pennsylvania Envtl. Council, Inc. v. Bartlett*, 315 F.Supp. 238 (D.C.Pa.1970), *aff'd*, 454 F.2d 613 (1971). Therefore, a river remains navigable regardless of whether its waters are in fact navigable throughout the entire year, *U.S. v. Florida*, 269 F.Supp. 903 (D.C.Fla.1967), as long as its practical utility as a means of transportation has not been permanently destroyed. *Harrison v. Fite*, 148 F. 781 (8th Cir.1906). Finally, the finding of whether a river is navigable is an issue of fact. *U.S. v. 101.88 Acres of Land*, 616 F.2d 762 (C.A.La.1980).

■ In the instant case it is uncontested that the Norwalk River is a navigable river. There has been some discussion, however, as to whether the Norwalk River was navigable at the time each of the above incidents took place. Specifically, plaintiffs contend that the expert testimony of Capt. Peter Stalkus ("Stalkus") established that during the four relevant time periods, the section of the Norwalk River in question was closed to navigation. Pls.' Post–Trial Mem. at 6. Buttressing plaintiffs' assertion, the Pilot states that "the harbor and river above South Norwalk are covered with ice during a part of the winter . . . a channel is ordinarily kept open to the [I–95] highway bridge, but the East Norwalk Channel and the channel in the river [north of the Metro North Bridge] are usually closed for about six weeks each winter." Def.Ex. KK. Despite these contentions the Court finds that the Norwalk River north of the Metro North Bridge was open to navigation during the four relevant periods. A distinction must be made between a river classified as unnavigable and a river closed to navigation for a particular period but nonetheless classified as navigable. This distinction, coupled with the evidence adduced at trial, supports the conclusion that the section

of the Norwalk River in question was navigable on the dates in question.

Scalise testified that he was aware that the river remained open to navigation throughout the year. Tr. at 62. Further, the excerpt from the Pilot, cited *supra*, states only that the river is "usually" closed for a certain period each winter. Def.Ex. KK. It does not specify the months during which the river is actually closed. In fact, defendants have provided ample proof that the river was not closed to navigation for the months of January and February, 1994 and February, 1995; the bridge logs for the Washington Bridge, the southernmost bridge on the Norwalk River, show that numerous vessels navigated up river on at least eight other days in January, 1994, and eleven other days in February, 1994. Def.Ex. NN. So too, in February, 1995, a variety of vessels navigated up river on at least ten days during the month. *Id.*

Moreover, the Court has not been presented with any evidence in the form of a Coast Guard order or any other form of notice stating that the river was closed during the periods in question. Even Salkus, plaintiffs' expert witness, admitted that he was not aware of any such notice having been issued for any of the dates in question. Tr. at 375. In fact, Salkus' testimony supports the conclusion that the Coast Guard had not closed the northern section of the Norwalk River. Specifically he stated, "in my opinion it [the river] was *highly restrictive* [to] normal navigation." *Id.* (emphasis added). He did not state that the river was in fact, or should have been, closed.

In light of the evidence, the Court concludes that the Norwalk River north of the Metro North Bridge was in fact open to navigation for the dates in question. Defendants' reliance upon the affirmative defense of the paramount right of navigation is thus well-placed.

## E. THE PARAMOUNT RIGHT OF NAVIGATION

■ Navigation for the purpose of commerce constitutes the paramount use of navigable waterways. *Penn Central Co. v. Buckley & Co.*, 293 F.Supp. 653, 658–59 (D.N.J.

1968), *aff'd*, 415 F.2d 762 (3d Cir.1969). This right, however, is a qualified one. The paramount right of navigation is limited by the obligation to exercise reasonable care in navigating so that the subservient rights of others are not unduly infringed. *CEH, Inc. v. Seafarer*, 880 F.Supp. 940, 950 (D.R.I.1995), *aff'd*, 70 F.3d 694 (1st Cir.1995); *Rogers v. Tallman & Mack Fish and Trap Co.*, 234 F.Supp. 358, 361–62 (D.R.I.1964). Hence, it has been held that "[w]hile it is true . . . that the right of navigation . . . is paramount to that of fishing, a navigator may not, by his own negligence, unnecessarily force those two rights to conflict and then claim the benefit of the paramount right." *Seafarer*, 880 F.Supp. at 950. Further, a vessel must take reasonable precautions to avoid damage, by reducing speed or changing course. *Byrd v. Belcher*, 203 F.Supp. 645, 647 (1962). As will be discussed *infra*, the instant case involves a conflict between the paramount right of navigation and the rights of riparian owners.

## F. WAKE DAMAGE

■ Plaintiffs have argued with some persuasiveness that the harm suffered in the instant case is closely analogous to the damage caused by the wake of a passing ship. Tr. at 16, 18. It is well-established that the damage produced from swells constitutes prima-facie evidence of liability on the part of the vessel that created the swell. *See, e.g., West India Fruit & S.S. Co. v. Raymond*, 190 F.2d 673, 674 (5th Cir.1951); *Alamia v. Chevron Trans. Corp.*, 660 F.Supp. 1123, 1127 (S.D.Miss.1987). In light of the foregoing, Reinauer provides its captains with instructions on how to avoid wake damage and information as to the penalties for causing such damage. Pl.Trial Ex. 41 ("Pl.Ex.").

■ Were the Court to accept the wake-damage analogy, we would proceed to employ a two-step analysis. First, plaintiffs would have to show that the damage caused by the ice was not to be "reasonably anticipated." *O'Donnell*, 228 F.Supp. at 909. Second, defendant vessel, as the cause of the wake, would be required to "exonerate herself from the blame by showing that it was not in her

power to prevent the injury by adopting any practical precautions." *Alamia,* 660 F.Supp. at 1127 (citing *West India Fruit,* 190 F.2d at 674); *see also Ladd v. United States,* 97 F.Supp. 80, 83 (E.D.Va.1951). A strong argument can be made that all four incidents of ice damage were to be reasonably anticipated by defendants.[1] The issue of whether or not defendants adopted all available "practical precautions" is more complex. However, these issues need not be further developed because we find, as a matter of law, the proposition that ice damage is analogous to wake damage to be dubious and not helpful in resolving this controversy.

### G. LEGAL PRECEDENT

This Court is aware of only a handful of cases that deal with the issue of damage caused to a stationary object by ice displaced by the movement of another vessel. Of those cases, two are clearly distinguishable from the instant case. In both *New York, N.H. & H.R. Co. v. Erie R. Co.,* 197 F.2d 148 (2d Cir.1952) and *The Reba,* 22 F. 546 (S.D.N.Y. 1884) the defendant's vessel, while in close proximity to the plaintiff's moored vessel, *and not yet within the navigable portion of the stream,* caused damage due to ice displacement. As the instant matter involves damage caused while defendant's vessels were *within the navigable portion of the river,* and the boats were not in "close proximity" of the dock, these cases do not serve as precedent for the case at bar.

Both defendants and plaintiffs have discussed the case of *Scott–Paine v. Motortanker V.L. Keegan II,* 339 F.2d 422 (2d Cir. 1964). Although the facts in *Scott–Paine* are similar to those in the instant matter, the case nevertheless does not provide a persuasive precedent. It is not clear from *Scott–Paine* exactly where in the river the defendant was when it caused the ice damage to plaintiff's moored vessel. Damage could have occurred as a result of the ship's activities in the navigable portion of the harbor or could have occurred after it had left the

navigable section and maneuvered into the dock. *Id.* at 424. Given this lack of clarity on a point critical point to the present case, we do not find this precedent compelling.

In *O'Reilly v. The New Brunswick, Amboy & New York Steamboat Co.,* 26 Misc. 195, 55 N.Y.S. 1133 (1899), *rev'd on other grounds,* 28 Misc. 112, 59 N.Y.S. 261 (1899), damage was caused to the plaintiff's moored vessel by ice displacement resulting from the defendant's vessel passing at a distance of 150 feet at a "very rapid[ ]" speed. *Id.* at 1134. In *O'Reilly* the court explicitly stated that "[b]oth of them had a right to· be there and the defendant did not have the exclusive right." *Id.* After noting that the defendant had previously been informed that the spot in question was a dangerous one in which to speed, the court concluded that it was the defendant's obligation to use care and caution and, if necessary, "to slow down her speed and keep as far away as she could safely be kept." *Id.* *O'Reilly* focused generally upon the defendant's negligence and the possibility of contributory negligence by the plaintiff.

█ The complexity of the issues raised in the instant matter, however, precludes us from limiting our discussion to this type of general analysis. Rather, we deem it more prudent to analyze the case in the greater context of maritime collision law, which is "not restricted to those cases in which two vessels or a vessel and a shore installations come together in direct, physical contact," but which also encompasses cases of damage caused by displacements of ice. *R & H Dev. Co. v. Diesel Tanker, J.A. Martin, Inc.,* 2 Conn.Cir.Ct. 622, 203 A.2d 766, 770 (1964). We therefore view the facts herein not in terms of simple negligence or wake damage, but rather under collision law.

### DISCUSSION

#### *APPLICATION OF MARITIME COLLISION LAW*

█ The facts of *R & H Development* and the collision-law analysis employed in

---

1. The record before us includes depositions taken in connection with this matter. *See* Tr. at 331. These depositions state that all the captains involved had many years of experience navigating the Norwalk River. Sanford Dep. at 6–10, Bo-

urque Dep. at 5–10, Markuske Dep. at 5–15. Presumably, then, they were aware of the possible danger to riparian structures that might result from navigating up an ice-bound river.

that case are highly relevant to the instant matter. In *R & H Development* a vessel maneuvering through the navigable waters of Greenwich Harbor, Connecticut, attempted to cut through a field of solid ice by moving the vessel back and forth until the ice broke. The pressure exerted on the ice ultimately snapped nine pilings located on the plaintiff's shore development. Noting that "[w]hether a vessel is to be held liable for damage caused by its passing through navigable waters must depend upon the facts and circumstances of the particular case," *Moran v. The Georgie May,* 164 F.Supp. 881, 884 (S.D.Fla. 1958), the court detailed a framework by which to analyze maritime collision cases. Of the issues delineated, four are applicable here: (1) the application of the "Pennsylvania Rule;" (2) the liability of a moving vessel that collides with a stationary object;[2] (3) the assumption of risk of riparian proprietors; and (4) the defense of inevitable accident.

## A. THE RULE OF THE PENNSYLVANIA

In *The Pennsylvania,* 86 U.S. 125, 22 L.Ed. 148 (1874), the Supreme Court set down the rule that, in a collision action, if it can be established that either vessel was in violation of a safety statute intended to prevent collisions, the burden shifts to the offending vessel to show "not only that her fault might not have been one of the causes, or that it probably was not, but that it could not have been" the cause of the mishap. *Id.* at 136. The Rule of The Pennsylvania is not a rule of liability, but rather a rule that shifts the burden of proof as to causation. *Green v. Crow,* 243 F.2d 401, 403 (5th Cir.1957). The Pennsylvania Rule has been expanded to include stationary *structures* in addition to vessels. *See, e.g., People v. The Italian Motorship Ilice,* 534 F.2d 836, 839 (9th Cir.1976) (applying rule to a bridge struck by a vessel).

In the instant case each party contends that its adversary was in violation of a statutory obligation and, therefore, its adversary carries the burden of showing, per the Pennsylvania Rule, that the violation could not have caused the damage. Specifically, plaintiffs assert that Reinauer violated 33 U.S.C. § 2002 on each of the four incidents. Section 2002 provides, in relevant part:

> [n]othing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

33 U.S.C. § 2002. Plaintiffs argue that defendants "did not take the necessary and reasonable precautions mandated by the attending circumstances, including proper assessment of the ice choked conditions on the Norwalk River, nor did they exercise prudence or reasonable care in navigating past the marina." Pls.' Post–Trial Mem. at 64.

### 1. January 16, 1994

With regard to the January 16, 1994, incident, plaintiffs' argument is untenable. Plaintiffs themselves admit that there were no eyewitnesses to the event, Pls'. Post–Trial Mem. at 8, that the evidence provided is "circumstantial,"[3] and that Sanford did not have "any specific recollection of the voyage," Sanford Dep. at 76. Plaintiffs' circumstantial evidence establishes nothing more than the simple fact that the *Cissi* passed the Marina on the date and time in question. It fails to advance plaintiffs' proposition that a statutory violation occurred or that Sanford "neglect[ed] [ ] any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case." 33 U.S.C. § 2002.

---

**2.** In admiralty, a moving vessel's striking a stationary object is referred to as an "allision." *Weyerhaeuser Co. v. Atropos Island,* 777 F.2d 1344, 1346 n. 1 (9th Cir.1985). As the parties here have not employed this term, for the sake of consistency, we will continue to use the term "collision."

**3.** *See* Tr. at 26, 30, 54, 87, 90 (Scalise testimony); *id.* at 212–14, 220–21 (testimony of Richard Scalise, Jr.); Pl.Ex. 24 (*Cissi* logbook); Pl.Ex. 42, Def.Ex. NN (Washington Bridge logs).

**2. January 24, 1994**

■ Plaintiffs assert that during the January 24, 1994, incident, defendants failed to take proper precautions, thereby violating Section 2002. Scalise and his son, Richard, Jr. ("Scalise, Jr."), both of whom witnessed and videotaped the passing of the Coast Guard vessel *Ballard* and defendants' tug *Cissi*, testified that it was the *Cissi*, due to its greater width when combined with the barge, that damaged certain parts of the Marina. Tr. at 35, 52–53, 233–34, 237. Plaintiffs stress that Markuske, the captain of the *Cissi* on that date, continued navigating past the Marina even though he heard yelling from the dock. Markuske Dep. at 47. Plaintiffs also argue that Markuske failed to comply with Coast Guard regulations pertaining to navigational equipment aboard his vessel; specifically, he did not consult the Pilot for the Norwalk River on the voyage in question. Markuske Dep. at 43; Pls.' Post–Trial Mem. at 18. Plaintiffs also note that it is unclear whether Markuske filed an incident report as he was required to do under the Reinauer Operations Manual. Markuske Dep. at 45–46, Pl.Post Trial Mem. at 17.

■ None of these arguments, however, in any way establishes the violation of a statutory safety measure intended to prevent collisions. Even if Markuske were aware that the man was screaming from the Marina because damage being caused,[4] such knowledge would fall far short of establishing a violation of a safety statute. Indeed, the Court has not been presented with, nor are we aware of, any safety statute that bars navigation in a federal channel if the navigation would result in unavoidable damage to a riparian structure. Moreover, it cannot be maintained that by continuing upriver, Markuske contravened Section 2002's general requirement that a captain exercise the "ordinary practice of seamen [in those] circumstances." 33 U.S.C. § 2002. The facts plainly show that the ordinary practice of seamen is to traverse the Norwalk River despite difficulties presented by ice. The Devine Bros. fuel storage facility long pre-existed the construction of the Marina. As discussed at length *supra*, pp. 1211–1212, the Norwalk River was open to navigation on the dates in question. Markuske's failure to consult the Pilot is of no consequence. While plaintiffs argue that this is a violation of Coast Guard regulations, Pls.' Post–Trial Mem. at 18, the Court is unaware of a specific regulation requiring a captain to reread the Pilot prior to each voyage.[5] Finally, Markuske's failure to file an incident report pursuant to company regulations, even if true, is hardly a violation of a statutory safety measure intended to avoid collisions. Therefore, we conclude that defendants were not in violation of Section 2002.

■ Plaintiffs also assert that the Reinauer vessel was in violation of 33 U.S.C. § 2005, which requires "[e]very vessel [to] at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision." 33 U.S.C. § 2005; *see* Markuske Dep. at 66–67; Pls.' Post–Trial Mem. at 64. Interestingly, plaintiffs do not contend that a look-out was absent, but rather that defendants' look-out was improperly positioned. Pls.' Pre–Trial Mem. at 10; Pls.' Post–Trial Mem. at 64–65. They assert that the look-out ought to have been posted on the barge, not in the wheelhouse. Pls.' Pre–Trial Mem. at 10; Pls.' Post–Trial Mem. at 64–65. But, as plaintiffs point out in their Post Trial Memorandum, it is the duty of a tug to maintain a look-out on a barge only when required by conditions of navigation. Pls.' Post–Trial Mem. at 65; *see, e.g., Gulf Oil Corp. v. The Socony No. 16*, 162 F.2d 869 (2d Cir.1947). Both Section 2005 and pertinent case law

---

4. The evidence does not conclusively support this supposition. *See* Markuske Dep. at 48–49.

5. Plaintiffs have pointed to no such regulatory violation. They instead maintain that the presumption arising from Markuske's not reading the Pilot is simply that he lacked knowledge

concerning the possible closing of the river: "he was not aware that the Norwalk River was closed for six weeks of the year due to icing conditions during the winter." Pls.' Post–Trial Mem. at 17. However, the Norwalk River was not closed to navigation on the dates in question. *See supra* pp. 1211–1212.

clearly indicate that what constitutes a proper look-out within the meaning of the statute is an issue of fact to be determined upon making explicit reference to "prevailing circumstances and conditions." 33 U.S.C. § 2005; *Walker v. Braus*, 861 F.Supp. 527, 531 (E.D.La.1994) (citing *Inland Oil and Trans. Co. v. Ark–White Towing Co.*, 696 F.2d 321, 325 (5th Cir.1983)).

The testimony and evidence presented at trial indicate that when the January 24, 1994, incident took place, the *Cissi* was traveling at a slow speed, that the accident occurred during daylight hours, and that there was no risk of sudden collision, given that the *Cissi* was following a narrow passage through the ice created by the Coast Guard Vessel *Ballard*. Markuske Dep. at 31; Pl.Ex. 23. We thus find, in light of these conditions and circumstances, that placing the look-out in the wheelhouse was proper under 33 U.S.C. Section 2005. Therefore, we hold that defendant did not commit a statutory violation in regard to the January 24, 1994, incident.

### 3. February 6, 1994

■ As to the third incident of February 6, 1994, plaintiffs claim that defendants again failed to take proper precautions while navigating and therefore violated Section 2002. Pls.' Post–Trial Mem. at 40. However, they have proffered no evidence to support this contention. Plaintiffs' memoranda simply outline the facts of the incident and speak only to the issues of causation and the measure of damages. Pls.' Pre–Trial Mem. at 12–16; Pls.' Post–Trial Mem. at 19–25. There is no evidence that Capt. Bourque was traveling too fast or that he was even aware that his passage was causing damage to the Marina. Bourque Dep. at 69. Therefore, we conclude that there was no violation of Section 2002.

■ Plaintiffs assert that defendants also violated Section 2005. Again, plaintiffs do not contend that a look-out was absent, but rather that defendant's look-out was positioned improperly in the wheelhouse instead of on the barge. Pls.' Post–Trial Mem. at 21, 64. As mentioned *supra*, p. 1215, it is the duty of a tug to maintain a lookout on a barge only when required by conditions of navigation, and that this question is one of fact to be determined in reference to prevailing circumstances and conditions. *See supra*, p. 1215.

The testimony and evidence presented to the Court indicate that the February 6, 1994, incident took place during daylight hours, on a clear day, and that there was no risk of sudden collision, given that the river upstream was a field of solid ice. Bourque Dep. at 60, 62; Pl.Ex. 23; Def.Ex. NN. We thus find, in light of these conditions and circumstances, that placing the look-out in the wheelhouse was proper under 33 U.S.C. Section 2005 and that no statutory violation occurred.

### 4. February 9, 1995

■ In regard to the last incident of February 9, 1995, the only claim of a statutory violation is one of general negligence, presumably made under 33 U.S.C. Section 2002. Pls.' Pre–Trial Mem. at 24. Plaintiffs make no assertion other than that the tug and barge, captained by Sanford, attempted to navigate upriver despite Sanford's knowing that these attempts were causing damage to the Marina. Tr. at 164–65, 172–74. Under the Rule of The Pennsylvania, plaintiffs must establish that a statutory violation occurred. *The Pennsylvania*, 86 U.S. at 136. Plaintiffs have failed to prove that merely attempting to traverse up river itself amounts to a statutory violation. Nor have plaintiffs shown that in attempting to navigate upriver, Sanford neglected any precaution required by the ordinary practice of seamen. Therefore, we conclude that the Pennsylvania Rule is not applicable to either the damage done to the Marina or the damage done to Lindwall's houseboat.

■ In response to plaintiffs' assertion that defendants violated statutory law, defendants contend that plaintiffs violated 33 U.S.C. § 403 by failing to secure the required Army Corps of Engineers permit to build the southernmost dolphin. Under the Pennsylvania Rule, plaintiffs have the burden of proving that this violation could not have been the cause of the damage. *The Pennsylvania*, 86 U.S. at 136. Defendants urge us

to follow precedent and apply the Pennsylvania Rule here. *Board of Comm. v. M/V Agelos Michael,* 390 F.Supp. 1012 (E.D.La. 1974) (applying Pennsylvania Rule to stationary structures lacking the permit required by Section 403); *Dow Chem. Co. v. Dixie Carriers, Inc.,* 330 F.Supp. 1304 (S.D.Tex. 1971), *aff'd,* 463 F.2d 120 (5th Cir.1972) (same); *United States v. Norfolk–Berkley Bridge Corp.,* 29 F.2d 115, 125 (E.D.Va.1928) (same); *Fast v. Western Trans. Co.,* 288 Or. 193, 604 P.2d 400 (1979) (same); *William B. Patton Towing Co. v. Spiller,* 440 S.W.2d 869 (Tex.Civ.App.1969) (same). However, the cases cited by defendants all involve a Section 403 violation that concerned an obstruction to navigation. Obstructions to navigation have historically included floating docks in navigable waters, *see, e.g., Fast,* 604 P.2d 400, and an overhang into navigable waters, *see, e.g., Agelos Michael,* 390 F.Supp. 1012. Here, the dolphin in question was set back from the navigable water line and in no way obstructed navigation. Pl.Ex. 1A. As there was no obstruction to navigation we, find the Rule of The Pennsylvania to be inapplicable.

### B. LIABILITY OF A MOVING VESSEL THAT COLLIDES WITH A STATIONARY OBJECT

■■■■ It is a well-established proposition of maritime collision law that when a moving vessel collides with a stationary object, "an inference of negligence arises and the burden is then upon the owners of the

vessel to rebut the inference of negligence." *General Petroleum Corp. v. Los Angeles,* 42 Cal.App.2d 591, 109 P.2d 754, 756 (1941); *see, e.g., Farrell Lines, Inc. v. The Birkenstein,* 207 F.Supp. 500, 505 (S.D.N.Y.1962). Therefore, the issue becomes whether defendants have presented sufficient evidence to rebut the presumption of negligence.

As discussed *supra,* pp. 1216–1217, defendants did not violate any safety statutes. We also find that at no time did defendants' vessels travel at an excessive speed. In fact, ice conditions were such that vessels could only navigate at slow speeds. Finally, plaintiffs have admitted that the mere fact of attempting to navigate up the river does not, by itself, constitute a failure to use reasonable care. Tr. at 15. These factors suffice to rebut the inference of negligence and support our conclusion that, with respect to all four incidents, there was no negligence on the part of defendants.

### C. RIPARIAN PROPRIETOR'S ASSUMPTION OF RISK [6]

■■■■ It is well-established at common law that a riparian proprietor whose land is bounded by a navigable stream has certain rights, including the right of access from the front of his lot to the navigable part of the river and the right to build a landing, wharf, or pier for his own or for public use. These rights are subject to such general rules and

---

**6.** It is well-established that assumption of risk is not a defense in admiralty law. *See United States v. Reliable Transfer,* 421 U.S. 397, 411 (1975) (barring the defense in admiralty cases involving commercial collisions); *Socony–Vacuum Oil Co. v. Smith,* 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939) (barring use of the defense in the context of Jones Act seaman's injury cases); *Skidmore v. Grueninger,* 506 F.2d 716 (5th Cir. 1975) (barring the defense in the context of a recreational-boating accident involving personal injury); *Manning v. Gordon,* 853 F.Supp. 1187 (N.D.Calf.1994) (barring the defense in the context of recreational-boating accident involving property damage). As the instant matter has been likened to a maritime collision, it could be argued that the assumption-of-risk defense would not apply. However, the instant case, as distinguished from the precedents cited *supra,* involves a collision with a riparian structure, and there is ample precedent that a riparian owner assumes certain risks. *See, e.g., O'Donnell Trans. Co., Inc.*

*v. M/V Maryland Trader,* 228 F.Supp. 903, 909 (S.D.N.Y.1963); *R & H Dev.,* 203 A.2d 766.

Although, defendants do not explicitly label this defense "assumption of risk," their pre-trial and post-trial memoranda, as well as their cross examination during trial, so strongly imply that assumption of risk is the legal theory presented that plaintiffs directly address this issue in their post-trial memorandum. *See* Defs.' Pre-Trial Mem. at 20–22, Defs.' Post-Trial Mem. at 25–29; Tr. at 58–63; Pls.' Post-Trial Mem. at 58–60. We hold that application of the assumption-of-risk defense is appropriate here.

Defendants invoke the concept of "inevitable accident." Our focus, however, is on the acts and omissions of the plaintiffs in the construction and location of their property, rather than the conduct of the defendants. Hence, we employ the terminology of "assumption of risk." Of course, the "risk" assumed is the occurrence of accidents despite due care by navigators.

**1218**

regulations as the legislature may see proper to impose. *Yates v. Milwaukee,* 77 U.S. 497, 504, 19 L.Ed. 984 (1870); *New York, New Haven & Hartford R. Co. v. Long,* 72 Conn. 10, 21, 43 A. 559 (1899). The right to construct a wharf derives from the right of access to "navigable" or "deep" water. 1 H.P. Farnham, Water and Water Rights § 62. For that reason, "as soon as the point of navigability is reached, the purpose of the pier is fulfilled, and the right to construct it ceases at that point." *Illinois Cent. R.R. Co. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). It has been held that the commercial operation of a marina, whose docks do not extend beyond the point of navigability, is a reasonable use of riparian rights. *Huntington v. Wood,* 97 A.D.2d 781, 468 N.Y.S.2d 520, 523 (1983).

The common-law right of riparian proprietors to build wharfs as far as the navigable water line has been superseded by 33 U.S.C. § 403. Section 403 prohibits the construction of "any obstruction . . . any wharf, pier [or] dolphin . . . in any . . . navigable river . . . except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." 33 U.S.C. § 403. With the one caveat discussed *supra,* p. 1216, it is uncontested that plaintiff Marina produced the appropriate Department of the Army Permit, Pl.Ex. 1; Def.Ex. OO, and thus did not violate Section 403.

 Along with the rights of riparian owners comes the assumption of certain risks and obligations. Specifically, docks must be maintained in good condition, vessels tied to them must be seaworthy and properly moored, and the dock owner must anticipate harm from passing vessels and guard against such damage. *O'Donnell Trans.,* 228 F.Supp. at 909; *see also Prolerized Chicago Corp. v. Hannah Inland Waterways Corp.,* 1981 A.M.C. 762, 766 (N.D.Ill.1980). Additionally, shore installations, by reason of their location, are "subject to the dangers incident to the paramount right of navigation, . . . [such as] accidents resulting from moving craft along the waterway." *R & H Dev.,* 203 A.2d at 770.

### 1. The Marina

 The question before us, then, is whether plaintiffs could have reasonably anticipated the ice damage. *See O'Donnell,* 228 F.Supp. at 909. In resolving this issue, we note the existence of videotaped evidence for the events of January 24, 1994, and February 6, 1994. Pl.Ex. 23. The fact that plaintiffs had a video camera readily available to record future damage by defendant is a strong indication that such damage was foreseeable. Moreover, upon inspecting the damage to the Marina on January 25, 1994, Capt. Olsen commented in his report that "it appears that this is going to be an ongoing problem for as long as there is ice on this river." Def.Ex. XX. Finally, Scalise, Jr., testified that he had called the tenders of the Metro North Bridge on the evening of January 23, 1994, the night *before* the second incident, to inquire whether there would be any bridge openings that night or morning. Upon being informed that there would be one the following morning, he arrived at the Marina an hour early "to witness if there's going to be any damage or problems." Tr. 216–17. Thus, the Court is led to the inescapable conclusion that the latter three incidents not only *should have been* reasonably anticipated but, in light of Scalise, Jr.'s testimony, *were in fact* reasonably anticipated by plaintiffs.

 The only issue that remains is whether plaintiffs could have reasonably anticipated the possibility of ice damage on January 16, 1994, the date of the first incident. A plaintiff assumes a risk of harm only when "the particular plaintiff in fact sees, knows, understands and appreciates" the risk involved. Restatement (Second) of Torts § 496D cmt. c. "One who has spent a substantial time upon a particular premises ordinarily would be found in fact to understand and appreciate the normal, ordinary risks of those premises." *Id.* cmt. d.

While it is true that prior to building the Marina, Scalise had no maritime experience, Tr. at 61, we find that the possibility of ice damage should nonetheless have been foreseeable to him from the outset. Notably, the Marina had been in operation for nearly five years before the events that gave rise to this action. Scalise had ample opportunity to

familiarize himself with a variety of risks involved in operating a marina situated north of the Metro North Bridge. Scalise testified that before he began the Marina project, he was aware that the Norwalk River was open to navigation twelve months out of the year, Tr. at 62, and that the Marina was built only ten feet from the navigation line, on one of the most severe turns in the Norwalk River, Tr. at 59. Moreover, he knew that oil and sand businesses were located upriver and that they received barge deliveries several times a week. Tr. at 60–61. Finally, the Pilot, a document with which any marina proprietor should have at least some familiarity, states that "[t]he harbor and river above South Norwalk are covered with ice during a part of the winter." Def.Ex. KK.

Taken together, this evidence leads us to conclude that the ice damage suffered by plaintiffs should have been reasonably anticipated by them and that they therefore assumed the risk of such harm. Accordingly, as to all four incidents in question, we find that defendants are not liable to the Marina for the damage caused by defendants' vessels.

## 2. Lindwall

As to plaintiff Lindwall, the houseboat owner whose property was damaged as a result of the February 9, 1995, incident, we find that like the Marina, Lindwall assumed the risk of ice damage. In so concluding, we view a houseboat as a "riparian structure." Its owner, like any other riparian proprietor, thus assumes foreseeable risks.[7]

Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, which prohibits any unauthorized riparian "obstruction" of the navigable capacity of the waters of the United States, contains a long, non-exclusive enumeration of riparian obstructions. 33 U.S.C. § 403; *see United States v. Republic Steel Corp.,* 362 U.S. 482 (1960); *Sierra Club v. Andrus,* 610 F.2d 581, 594–97 (9th Cir.1979), *rev'd on other grounds,* 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). Included in this list is the term "other structures," defined in the Army Corps of Engineers'

regulations to cover a "permanently moored floating vessel." 33 C.F.R. § 322.2(b) (1993). In light of this definition, a number of courts have found that houseboats may fall within Section 403's prohibition, *United States v. Boothby,* 16 F.3d 19, 21 (1st Cir.1994); *United States v. Boyden,* 696 F.2d 685, 687 (9th Cir.1983); *United States v. Oak Beach Inn Corp.,* 744 F.Supp. 439, 444 (S.D.N.Y.1990), noting, however, that the question of whether a houseboat is a "permanently moored floating vessel" is one of fact. *Oak Beach,* 744 F.Supp. at 444.

The fact that a houseboat is capable of moving on its own, does not, by itself, preclude the conclusion that it is a "permanently moored vessel" and thus a riparian structure. "The capacity to navigate is not the only factor to be considered in [such an] analysis. Such capability is only one of the factors to be considered. It is not determinative." *United States v. Seda Perez,* 825 F.Supp. 447, 452 (D.P.R.1993); *c.f. Boothby,* 16 F.3d at 22 (houseboat certified as navigable defined as a permanently moored vessel). In making our determination as to the houseboat's proper classification, we pay particular attention to the houseboat's primary purpose. *C.f. Tonnesen v. Yonkers Contracting Co. Inc.,* 82 F.3d 30, 36 (2d Cir.1996) (In determining, under the Jones Act, whether a floating structure is a "vessel in navigation" the present primary purpose of the structure is of extreme importance). The houseboat served as Lindwall's place of residence at the Marina for more than seven months prior to February 9, 1995. Tr. at 135. Thus, as the primary purpose of Lindwall's houseboat was residential, and as there is no evidence that the houseboat was ever moved during the seven-month period, we conclude that the houseboat is a "permanently moored vessel," subject to Section 403.

Consequently, viewing the houseboat as a riparian structure, we find its owner to have assumed the same risks as any other riparian proprietor. Lindwall, a middle-aged man, has owned boats since he was twelve years old. Tr. at 174. Based on these years

---

7. Were we instead to characterize a houseboat as a "naval vessel" the assumption-of-risk defense would be unavailable to defendants. *See supra* note 6.

of experience he should have been familiar at least with the existence of the Pilot for the Norwalk River. Moreover, the Marina's vulnerable location was easily observable. Thus, even without having consulted the Pilot, Lindwall should have anticipated the possibility of ice damage and, as an experienced boat owner, should have questioned the Scalises about berthing conditions during the winter. There is no evidence that Lindwall ever asked these questions, although he plainly had the opportunity to question the Scalises on this point: Lindwall testified that he had negotiated a winter berthing for his houseboat with the Scalises prior to the start of the winter season. Tr. at 155–56. Thus, based upon Lindwall's prior experience as a boat owner, his ability to observe the location of the Marina, and his opportunity to question the Scalises, who were well-aware of the prior incidents, we conclude that Lindwall assumed the risk of the harm caused by defendants' vessels and that defendants accordingly are not liable to him for that damage.

## CONCLUSION

This litigation presents an unusually clear conflict between the rights of riparian owners and the paramount right of navigation. Although plaintiffs embellish their claims with allegations of safety violations and negligence, we have found (and plaintiffs' counsel has on occasion acknowledged, Tr. at 16, Pl. opening statement) that the gist of plaintiffs' claim is defendant's exercise of the right of navigation through the federal channel of the Norwalk river. We speak of "exercise" of that right to emphasize several factors:

1. Here, unlike what appears to have been the case in *R & H Development*[8], there was no readily available alternative route for barge delivery of heating oil during the winter months to the pre-existing Devine Bros. facility. If in fact it was a violation of plaintiffs' rights to make or attempt passage in front of the marina during ice conditions the economic consequences to the owner of the oil storage facility and its local customers might be significant. We make reference to this factor simply to note that the use of the river for barging oil was not optional or merely recreational and that therefore, the passage of barges in this body of water was entirely foreseeable.

2. We find that there was no negligence in the staffing, equipment, or operation of the tug. There was no use of excessive speed or force or poor seamanship.

That the consequence of a vessel passing the marina in the manner required to pass under the nearby bridge, would disperse ice in the vicinity of the marina was entirely foreseeable. The impact of such ice was increased by plaintiffs' use of bubbling devices to prevent ice from forming near the Marina, thereby increasing the force which the dispersed ice would gather as it passed through the clear water immediately adjacent to the piers. We conclude that defendants are not liable for the damage to the Marina and to Lindwall's houseboat on the dates in question.

SO ORDERED.

---

**8.** The Court in *R & H Development* concluded, "The plaintiff sought ordinary relief for damages. Since we find the vessel was guilty of a statutory fault before the accident, the burden fell upon the defendant to absolve itself from liability ... it cannot be said that it was unreasonable for the court to find, as it did, that on the facts of the case there were reasonable alternatives of navigation the pursuit of which could have prevented the damage without imposing an onerous burden on the vessel." 2 Conn.Cir.Ct. at 631, 203 A.2d at 772.

PLAINTIFF'S EXHIBIT

PLATT ST.

So. SMITH ST.

N

NORWALK RIVER

federal channel limit line

A.

B.

C.

D.